Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Garin Scollan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                             Plaintiffs,

        -against-

DMITRY BANGIYEV,
MARK KOVALEVSKIY, M.D.,
713 MEDICINE P.C.,
PARAMOUNT ANESTHESIA PRACTICE, P.C.,
MK MEDICAL CARE P.C.,
MICHAEL WESLEY TODD, D.C.,
BALANCE FIT CHIROPRACTIC, P.C.,
ACTIVE RELEASE CHIROPRACTIC, P.C.,
WESLEY DIVERSIFIED CHIROPRACTIC, P.C.,
ANATOLIY ABAKIN, D.C.,
ABA CHIROPRACTIC, P.C.,
SHERVIN SAKINI, D.C.,
SACRUM CHIROPRACTIC, P.C.,
AHMED S. AHMED, DPT,
ELMONT PT, P.C., and
JOHN DOE DEFENDANTS "1"-"10",

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

    Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against defendants Dmitry Bangiyev, Mark Kovalevskiy, M.D., 713 Medicine P.C., Paramount Anesthesia Practice, P.C., MK Medical Care P.C., Michael Wesley Todd, D.C., Balance Fit Chiropractic, P.C., Active Release Chiropractic, P.C., Wesley Diversified Chiropractic, P.C., Anatoliy Abakin, D.C., ABA Chiropractic, P.C., Shervin Sakini, D.C., Sacrum Chiropractic, P.C., Ahmed S. Ahmed, DPT, Elmont PT, P.C., and John Doe Defendants "1"-"10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $2,825,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-fault insurance charges relating to medically unnecessary, experimental, excessive, illusory, and otherwise unreimbursable healthcare services, which were the product of a scheme whereby unlicensed laypersons conspired with licensed healthcare professionals to illegally control professional healthcare corporations and dictate the provision of medically unnecessary services allegedly provided to New York automobile accident victims insured by GEICO ("Insureds").  The medically unnecessary services included initial and follow-up examinations, initial consultations, radial pressure wave therapy ("RPWT") falsely billed as extracorporeal shockwave therapy ("ESWT"), nerve conduction velocity ("NCV") testing and electromyography ("EMG") studies, outcome assessment testing ("OAT"), trigger point injections, chiropractic, and physical therapy (collectively, the "Fraudulent Services").

2.     Defendants Dmitry Bangiyev ("Bangiyev") and John Doe Defendants "1" – "5" (collectively, the "Management Defendants") spearheaded the fraudulent scheme to exploit New York's No-fault system together with Mark Kovalevskiy, M.D. ("Kovalevskiy"), who is a New York physician who purports to own and operate 713 Medicine P.C. ("713 Medicine"),

Paramount Anesthesia Practice, P.C. ("Paramount"), and MK Medical Care P.C. ("MK Medical") (collectively the "Medical PC Defendants"), which billed GEICO and other New York automobile insurers millions of dollars as part of a massive scheme to exploit New York's No-fault insurance law.

3.     Kovalevskiy agreed to falsely hold himself out as the owner of 713 Medicine, Paramount, and MK Medical, knowing that they would be used to submit fraudulent billing.  The Management Defendants, who are unlicensed laypersons, conspired with Kovalevskiy to have the Medical PC Defendants provide medically unnecessary healthcare services to Insureds through 713 Medicine and Paramount at 104-08 Roosevelt Avenue, Corona, New York  (the "Roosevelt Ave Clinic") and through MK Medical at 64 Nagle Avenue, New York, New York (the "Nagle Ave Clinic"). The Roosevelt Ave Clinic and the Nagle Clinic (the "Clinics") both operated as though ostensibly organized to provide a range of medical services to Insureds at a single location, but were, in fact, actually set up under the illegal control of the Management Defendants as one-stop shops for No-fault insurance fraud.

4.     As a further part of the scheme, the Management Defendants had Kovalevskiy enter into sham rental arrangements with a series of other healthcare providers at the Clinics that the Management Defendants also unlawfully owned and controlled, including Balance Fit Chiropractic, P.C. ("Balance Chiro"), Active Release Chiropractic, P.C. ("Active Chiro"), Wesley Diversified Chiropractic, P.C. ("Wesley Chiro"), ABA Chiropractic, P.C. ("ABA Chiro"), Sacrum Chiropractic, P.C. ("Sacrum Chiro") and Elmont Rehab PT, P.C. ("Elmont PT") (collectively the "Subleasing PC Defendants").  The Management Defendants used these healthcare practices to submit additional fraudulent billing to GEICO for a range of medically unnecessary healthcare services purportedly provided at the Clinics.

5.    The Defendants' fraudulent insurance scheme against GEICO and the New York automobile insurance industry was massive, and involved billing to GEICO alone of more than $4.4 million for the alleged performance of the Fraudulent Services at the Clinics.

6.    The Defendants fall into the following categories:

(i)    Kovalevskiy is a New York physician who falsely purports to own, control and operate the medical "practices" at the Clinics, operating under the names 713 Medicine, Paramount, and MK Medical.

(ii)    713 Medicine, Paramount, MK Medical, Balance Chiro, Active Chiro, Wesley Chiro, ABA Chiro, Sacrum Chiro, and Elmont PT (collectively, the "PC Defendants") are medical, chiropractic, and physical therapy professional corporations through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO, for the sole purpose of exploiting the Insureds' No-Fault insurance benefits;

(iii)    The Management Defendants (Bangiyey and John Doe Defendants "1"- "5") are individuals and/or entities who are not licensed physicians but who participated in the fraudulent scheme perpetrated against GEICO by, among other things, illegally participating in the ownership of the PC Defendants, dictating the provision of medically unnecessary services by the PC Defendants, engaging in illegal financial and kickback arrangements to obtain patient referrals, and spearheading pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care;

(iv)    Michael Wesley Todd, D.C. ("Todd"), Anatoliy Abakin, D.C. ("Abakin"), Ahmed S. Ahmed ("Ahmed" and collectively with Todd and Abakin, the "Nominal Owner Defendants") are licensed health care professionals in the State of New York. Todd purportedly owns Balance Chiro, Active Chiro, and Wesley Chiro; Abakin purportedly owns ABA Chiro; Sakini purportedly owns Sacrum Chiro; and Ahmed purportedly owns Elmont PT; and

(v)    John Doe Defendants "6"-"10" are additional individuals and/or entities who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants, the provision of medically unnecessary services, and "brokering" or "controlling" access to patients in exchange for illegal kickback payments.

7.    The billing for the Fraudulent Services at the Clinics was the product of the

Management Defendants illegally establishing the Clinics as purported multidisciplinary "medical clinics," creating a patient base for the Clinics, and "buying" the professional licenses of Kovalevskiy and the Nominal Owner Defendants in order to fraudulently incorporate, control, and operate the PC Defendants at the Clinics. The Management Defendants then used their control of the Clinics, the patient base, and the professional corporations: (i) to require the Nominal Owner Defendants and the Subleasing PC Defendants to pay kickbacks, in exchange for the referral of automobile accident victims to the Clinics, as a condition of renting office space at the Clinics; and (ii) to implement a fraudulent, predetermined treatment and billing protocol in order to enrich themselves by exploiting the Insureds' no-fault insurance benefits.

8. In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,080,000.00 in pending no-fault insurance claims for the Fraudulent Services because, as discussed below, the Defendants have, at all relevant times, known that the claims for the Fraudulent Services submitted to GEICO were fraudulent because:

(i) the PC Defendants are fraudulently incorporated and/or unlawfully owned, controlled, and operated by unlicensed laypersons;

(ii) the Defendants submitted claims for Fraudulent Services under the names of the PC Defendants that were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed by unlicensed laypersons to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) the Defendants engaged in a scheme to defraud New York automobile insurers using illegal fee-splitting, kickback, and referral arrangements in connection with illegally operating and controlling the PC Defendants;

(iv) the billing codes used for the Fraudulent Services submitted under the names of the PC Defendants misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(v)     virtually all of the ESWT purportedly provided through 713 Medicine and MK Medical were provided – to the extent provided at all – by independent contractors rather than by Kovalevskiy, the Medical PC Defendants or their employees in violation of the no-fault laws and regulations.

9.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the PC Defendants.

10.     The charts annexed hereto as Exhibits "1" – "9" set forth a large, representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

11.     The Defendants' fraudulent scheme, which commenced in or about 2020, has continued uninterrupted through the present day.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,825,000.00.

## THE PARTIES

### I.      Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

13.     Defendant Bangiyev resides in, is domiciled in, and is a citizen of New York. Bangiyev is a non-physician who along with the other Management Defendants, at all relevant times, secretly and unlawfully owned, controlled, and operated the PC Defendants. Bangiyev and the other Management Defendants exercised illegal ownership and control over the PC

Defendants to siphon profits from the PC Defendants to himself and others. Bangiyev is also the Chief Executive Officer of Impress Services, Inc. and BND Billing & Consulting, Inc., which, upon information and belief, were companies used by Bangiyev and the other Management Defendants to perpetuate the Defendants' fraudulent scheme.

14.     Bangiyev is no stranger to fraudulent schemes, as his wife, Natalya Bangiyev, was named as a defendant in a no-fault insurance fraud lawsuit alleging, among other things, that she and other laypersons illegally owned and controlled multiple healthcare practices billing from a purported multidisciplinary medical clinic located in Bronx, New York and directed the predetermined treatment and billing protocols at this clinic. *See Gov't Emples. Ins. Co., et al, v. Y A Medical Care, PLLC, et al*, 18-cv-08037-PGG (E.D.N.Y.). Additionally, upon information and belief, Bangiyev was named as a defendant in a trademark infringement action where it was alleged Bangiyev and his company sold counterfeit sunglasses, including from Bangiyev's storefront in Brooklyn, New York. *See Luxottica Group S.p.A. v. National Optical et al*, 18-cv-03900-AT (S.D.N.Y.).

15.     Defendant Kovalevskiy resides in, is domiciled in, and is a citizen of New York. Kovalevskiy was licensed to practice medicine in New York on July 13, 2004 and is the purported owner of  713 Medicine, Paramount, and MK Medical.

16.     Defendant 713 Medicine is a New York professional corporation incorporated on or about September 13, 2021, with its principal place of business in New York.

17.     Defendant Paramount is a New York professional corporation incorporated on or about September 11, 2008, with its principal place of business in New York, and was the professional corporation which Kovalevskiy purportedly treated patients through prior to 713 Medicine at the Roosevelt Ave Clinic.

18.     Defendant MK Medical is a New York professional corporation incorporated on or about August 30, 2019, with its principal place of business in New York.

19.     Defendant Todd resides in, is domiciled in, and is a citizen of New York. Todd was licensed to practice chiropractic in New York on December 6, 2007 and is the purported owner of Balance Fit, Active Chiro, and Wesley Chiro.

20.     Defendant Balance Chiro is a New York professional corporation incorporated on or about August 25, 2017, with its principal place of business in New York.

21.     Defendant Active Chiro is a New York professional corporation incorporated on or about February 9, 2022, with its principal place of business in New York.

22.     Defendant Wesley Chiro is a New York professional corporation incorporated on or about December 17, 2019, with its principal place of business in New York.

23.     Defendant Abakin resides in, is domiciled in, and is a citizen of New York. Abakin was licensed to practice chiropractic in New York on December 24, 2001 and is the purported owner of ABA Chiro.

24.     Defendant ABA Chiro is a New York professional corporation incorporated on or about September 2, 2022, with its principal place of business in New York.

25.     Defendant Sakini resides in, is domiciled in, and is a citizen of New York. Sakini was licensed to practice chiropractic in New York on November 1, 2018 and is the purported owner of Sacrum Chiro.

26.     Defendant Sacrum Chiro is a New York professional corporation incorporated on or about September 27, 2019, with its principal place of business in New York.

27.     Defendant Ahmed resides in, is domiciled in, and is a citizen of New York. Ahmed was licensed to practice physical therapy in New York on April 15, 1998 and is the

purported owner of Elmont PT.

28.     Defendant Elmont PT is a New York professional corporation incorporated on or about March 11, 2010, with its principal place of business in New York.

29.     John Doe Defendants "1" – "5" reside, are domiciled in, and are citizens of New York and include persons and/or entities who are presently not identifiable and, along with Defendant Bangiyev (collectively, the "Management Defendants"), are not licensed physicians but who participated in the fraudulent scheme perpetrated against GEICO by, among other things, illegally participating in the ownership of the PC Defendants, dictating the provision of medically unnecessary services by the PC Defendants, engaging in illegal financial and kickback arrangements to obtain patient referrals, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

30.     John Doe Defendants "6" – "10" (the "John Doe Defendants") reside, are domiciled in, and are citizens of New York and are persons and/or entities who are presently not identifiable but who participated in the fraudulent scheme perpetrated against GEICO by, among other things, assisting with the operation of the PC Defendants, the provision of medically unnecessary services, and "brokering" or "controlling" access to patients in exchange for illegal kickback payments.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

32.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has

supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

34.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

35.     New York's No-Fault Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

36.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

37.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

38.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care

Financing Administration insurance claim form (known as the "HCFA-1500 form").

39.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

40.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

41.    In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

42.    Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

43.    New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. *See*, *e.g.*, New York Education Law §§ 6509-a; 6530(18); and 6531.

44.    New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. *See*, *e.g.*, New York Education Law § 6512, § 6530(11), and (19).

45.    Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in

exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

46.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and/or local laws.

47.     In *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed individuals are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

48.     Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

49.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

50.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

51.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

52.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Overview of the Scheme and the Fraudulent Incorporation, Ownership, and Operation of the PC Defendants

53.     Beginning in 2020, and continuing uninterrupted through the present day, Bangiyev and the other Management Defendants implemented a complex fraudulent scheme in which the PC Defendants were used to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, excessive, illusory, and/or otherwise non reimbursable healthcare services allegedly performed at the Clinics.

54.     The Clinics (*i.e.*, the Roosevelt Ave Clinic and the Nagle Clinic) both operated as though ostensibly organized to provide a range of medical services to Insureds at a single location,

but were in fact actually set up under the illegal control of the Management Defendants as one-stop shops for No-fault insurance fraud.

55.    Kovalevskiy and the Nominal Owner Defendants did not establish their own practices at the Clinics, but rather were recruited at one time or another by the Management Defendants to serve as sham owners of the PC Defendants.

56.    Kovalevskiy and the Nominal Owner Defendants did not advertise or market their association with the Clinics to the general public and did nothing to attract patients or create a patient base for their alleged professional "practices" at the Clinics.

57.    Bangiyev and the other Management Defendants, rather than Kovalevskiy and the Nominal Owner Defendants, created and controlled the Clinics, the PC Defendants, and the patient base at the Clinics, while concealing themselves as allegedly providing purported office and/or management services in order to avoid detection of the illegal scheme.

58.    In furtherance of the scheme, and in order to circumvent New York law and to induce the New York State Education Department to issue a certificate of authority authorizing the PC Defendants to operate as healthcare professional corporations or to permit them to operate as legitimately controlled professional practices, the Management Defendants entered into secret schemes with Kovalevskiy and the Nominal Owner Defendants. Specifically, in exchange for a designated salary or other form of compensation from the Management Defendants, Kovalevskiy and the Nominal Owner Defendants agreed to falsely represent in the Certificates of Incorporations and related filings with New York State that they were the true shareholders, directors, officers, or owners of the PC Defendants, and that they truly owned and controlled the professional corporations. Additionally, in order to disguise their illegal kickback scheme, the Management Defendants had the Subleasing PC Defendants enter into sham written lease or other agreements

with the Management Defendants and/or Kovalevskiy to rent space at the Clinics.

59.    Kovalevskiy and the Nominal Owner Defendants falsely represented in the certificates of incorporations and related filings with New York State that they were the true shareholders, directors, officers, and owners of the PC Defendants, and that they truly owned and controlled the professional corporations and professional practices, knowing that the PC Defendants would be used to submit fraudulent billing to insurers, including GEICO.

60.    Although Kovalevskiy and the Nominal Owner Defendants were listed as the record owners of the PC Defendants on the Certificates of Incorporation, or otherwise identified as the licensed professionals controlling the professional practices, Kovalevskiy and the Nominal Owner Defendants exercised no genuine ownership or control over the PC Defendants or the profits that were generated from them.

61.    Kovalevskiy and the Nominal Owner Defendants have never been the true shareholders, directors, officers, or owners of the PC Defendants, and never had any true ownership interest in or control over their respective professional corporations and practices.

62.    True ownership and control over the PC Defendants has always rested entirely with the Management Defendants, who used the facade of the PC Defendants to do indirectly what they are forbidden from doing directly, namely: (i) employ medical professionals; (ii) control those medical professionals' practices; and (iii) charge for and derive an economic benefit from their services.

63.    Bangiyev and the other Management Defendants maintained control over the PC Defendants and the Clinics through a series of financial and kickback agreements/arrangements that involved, among other things: (i) leasing of the physical space at the Clinics to other healthcare providers, including through their control of a written Assignment of Lease between ABA Chiro to

Paramount; (ii) obtaining and causing the healthcare practices to cause referrals/prescriptions to be issued for, among other things, durable medical equipment, pharmaceuticals, and MRIs, virtually all of which were medically unnecessary, to the extent they were provided at all; and (iii) requiring the Nominal Owner Defendants and the Subleasing PC Defendants (*i.e.*, Balance Chiro, Active Chiro, Wesley Chiro, ABA Chiro, Sacrum Chiro, and Elmont PT) to pay illegal kickbacks in exchange for patient referrals to the Clinics.

64.     While these agreements and arrangements ostensibly were created to permit the Management Defendants to provide services, or facility space and equipment, they were actually used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the PC Defendants; and (ii) to siphon the profits that were generated by the billings submitted to GEICO and other insurers through the PC Defendants.

65.     The net effect of the agreements and financial arrangements between the PC Defendants enabled the Management Defendants to maintain control over the PC Defendants, their accounts receivable, and any revenues that might be generated therefrom.

66.     The Management Defendants' unlawful ownership and control of the PC Defendants compromised patient care because the provision of health services through the PC Defendants was subject to the pecuniary interests of its non-medical professional owners, not the independent medical judgment of a true medical professional-owner.

67.     Kovalevskiy and the Nominal Owner Defendants had no genuine physician-patient relationship with the Insureds that visited the Clinics, as the patients were simply directed by the Management Defendants to subject themselves to treatment by whatever healthcare providers were on duty that day solely to maximize profits.

68.     Once Insureds arrived at the Clinics for treatment, the Management Defendants dictated the medical services that each patient received from the PC Defendants, regardless of the actual medical needs of the individual Insureds.

69.     The Management Defendants established predetermined treatment protocols in order to bill for voluminous, unnecessary, and excessive treatments that were provided (or purported to be provided) regardless of the actual medical needs of each individual Insured.

70.     In keeping with the fact that the Clinics have been under the control of the Management Defendants, and not the licensed healthcare professionals, GEICO has received billing submitted under the names of more than 75 purportedly different healthcare providers that have operated from the Clinics during various time periods, purportedly rendering and billing for a high volume of medically unnecessary healthcare services.

71.     The 75 purportedly different healthcare providers that have operated from the Clinics included the PC Defendants as well as multitude of other pain management practices, physical therapy practices, acupuncture practices, diagnostic testing practices and psychology practices, which opened and closed at the Clinics without any legitimate explanation, without any legitimate sale of a practice, and without any legitimate transfer of patient care.

72.     Throughout the course of the PC Defendants' relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Clinics and the PC Defendants at the Clinics was vested entirely with the Management Defendants.

73.     The Management Defendants' decision-making authority relating to the operation and management of the Clinics and the PC Defendants included control over the treatment protocols, including what treatments, testing, and other services the Insureds received, what referrals and prescriptions the Insureds received, and what healthcare providers or professional

corporations would render those services.

74.     In reality, Kovalevskiy and the Nominal Owner Defendants were never anything more than de facto employees of the Management Defendants who at all relevant times remained firmly in control of all professional entities, healthcare services, patients, and profits generated at the Clinics.

**B.     The Illegal Kickback and Referral Relationships at the Clinics**

75.     Kovalevskiy and the Nominal Owner Defendants did virtually nothing to advertise for patients, never sought to build name recognition, or make any legitimate efforts of their own to attract patients on behalf of the PC Defendants.

76.     Instead, Kovalevskiy and the Nominal Owner Defendants received a steady volume of patients through no efforts of their own at the Clincs through illegal fee-splitting, kickback, and referral arrangements.

77.     In addition, the Nominal Owner Defendants and the Subleasing PC Defendants, as a precondition of renting office space at the Clinics, were required to pay kickbacks in exchange for the referral of automobile accident victims to the Clinics.

78.     In keeping with the fact that the Nominal Owner Defendants and the Subleasing PC Defendants paid kickbacks in exchange for the referral of automobile accident victims to the Clinics, ABA Chiro and Elmont PT issued approximately $40,000.00 to entities associated with Natan Yusufov ("Yusufov") during the time Yusufov was participating in a health care fraud scheme.

79.     Yusufov was indicted for his participation in a $146 million-dollar health care fraud scheme based on allegations that, among other things, he utilized (i) "recruiters" who identified potential patients, offered cash to induce a person to become a patient, and coordinated

their transportation to affiliated, fraudulent medical clinics and (ii) "shell" businesses and corporations that laundered the proceeds of the health care fraud. *See People v. Kristina Mirbabayeva*, Indictment No. 9476/2017 (Kings Cty. 2017). On April 4, 2019, Yusufov pleaded guilty to, among other things, Money Laundering in the Third Degree. At his plea allocution, Yusufov confirmed that he served as the "de facto manager" of several entities, and that he knew that the property involved in one or more financial transactions of those entities represented the proceeds of health care fraud.

80.     In further keeping with the fact that the Nominal Owner Defendants and the Subleasing PC Defendants paid kickbacks in exchange for the referral of automobile accident victims to the Clinics, a company called ABA Chiro previously issued over $25,000.00 in purported payments to Wizard Computer Systems Inc. ("Wizard"), while Balance Chiro previously issued over $15,000 in payments to Wizard. Wizard has a history of involvement in no-fault fraud schemes, including participating in a large-scale money-laundering operation by exchanging for cash checks issued by other no-fault healthcare providers to Wizard at a check cashing facility in New Jersey. The checks payable to Wizard were exchanged for cash by a woman named Alla Kuratova ("Kuratova"), who was previously indicted for recruiting individuals to act as phony patients.

81.     For a period of over five years, Kuratova illegally exchanged more than $35 million worth of checks for cash at various New Jersey check-cashing facilities. When deposed in connection with a separate no-fault insurance fraud action, Kuratova invoked her Fifth Amendment privilege against self-incrimination when asked whether the millions of dollars' worth of checks were exchanged for cash to funnel money to unlicensed individuals that controlled medical clinics in exchange for patient referrals.

82.     In further keeping with the fact that the Defendants engage in illegal kickback arrangements at the Clinics, Bangiyev's two companies, Impress Services, Inc. and BND Billing & Consulting Inc., have received thousands of dollars in payments from companies named as defendants in no-fault fraud lawsuits in the Eastern District of New York, including but not limited Omar F. Ahmed, M.D. ("Ahmed") and Queens Corona Medical, P.C. ("Queens Corona"). Ahmed is no stranger to no-fault schemes. In fact, Ahmed has been named as a defendant in several lawsuits in the Eastern District of New York, alleging, among other things, that Ahmed paid illegal kickbacks in exchange for patient referrals and provided healthcare services pursuant to pre-determined treatment protocols and the dictates of laypersons. *See Allstate Ins. Co. et al v. Omar F. Ahmed, M.D. et al*, 1:24-cv-03126-JRC (E.D.N.Y.); *see also State Farm Mut. Auto. Ins. Co. et al v. ENS Medical, P.C. et al*, 1:23-06937-OEM-VMS (E.D.N.Y.); *see also Government Employees Ins. Co. et al v. Northern Medical Care, P.C. et al.*, 1:20-cv-01214-FB-LB (E.D.N.Y.); *see also Government Employees Ins. Co. et al. v. Ahmed et al*, 1:22-cv-01679-ENV-SJB (E.D.N.Y.)

83.     What is more, during the same time period when Ahmed and Queens Corona made payments to Bangiyev, Impress Services, Inc., and BND Billing & Consulting, Inc., Ahmed and Queens Corona issued hundreds of thousands of dollars to dozens of companies which had no legitimate operations, including but not limited to companies associated with Yusufov and a series of companies that were also paid by Tea Kaganovich ("Kaganovich") and Ramazi Mitaishvili ("Mitaishvili"), who admitted to paying approximately $18.5 million in kickbacks for the referral of patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx in connection with pleading guilty to health care fraud in the Eastern District of New York. *See United States of America v. Tea Kaganovich, Ramazi Mitaishvili*, 17-CR-00649 (E.D.N.Y. 2019).

84.     The payment of kickbacks by the Defendants allowed the Defendants to have

access to a steady stream of Insureds at the Clinics that could be subjected to the Fraudulent Services billed through the PC Defendants.

85.    The Defendants' ability to pay kickbacks was continually fueled by the millions of dollars paid by New York automobile insurers to the PC Defendants, which was generated by the Fraudulent Services and excessive billing that resulted from the Insureds being referred to the Clinics.

86.    The referrals to the Defendants were made without regard for the medical necessity of the health care services purportedly performed by the PC Defendants or the Insureds' individual symptoms or needs. The Fraudulent Services were provided – to the extent they were provided at all – solely for financial gain, not to genuinely treat or otherwise benefit the Insureds.

87.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants would not have had access to the Clinics and the Insureds but for the payment of kickbacks.

88.    No legitimate professional owner of a medical practice, exercising independent judgement in the best interests of patients, would refer or direct Insureds to the PC Defendants for treatment when the Fraudulent Services that the PC Defendants purported to perform and/or provided played no genuine role in the treatment or care of the Insureds.

89.    In addition to making illegal kickback payments to sham companies and other individuals, including but not limited to the John Doe Defendants, the Subleasing PC Defendants, to the extent that the Subleasing PC Defendants entered into written lease or other agreements with the Management Defendants to rent space at the Clinics, entered into sham agreements in that the agreements were not consistent with fair market value to "lease" space.

90.    The Subleasing PC Defendants paid more than the fair market value to "lease"

space from the Management Defendants at the Clinics because the purported lease payments were disguised kickbacks in exchange for gaining access to the patients referred to the Clinics in exchange for illegal kickback payments.

91.    In addition to paying kickbacks and entering into these sham lease agreements, the Management Defendants required Todd, Wesley Chiro, Balance Chiro, Sakini, Sacrum Chiro, Abakin, and ABA Chiro to issued prescriptions for medically unnecessary durable medical equipment.

92.    In sum, (i) the Defendants gained access to patients through illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals who "brokered" or "controlled" access to patients, including John Doe Defendants, so that the Defendants could subject Insureds to the Fraudulent Services, solely because of the illegal kickbacks paid by the Defendants; (ii) the Nominal Owner Defendants and the Subleasing PC Defendants paid sham "rent" to gain access to patients at the Clinics and to allow the Management Defendants to further illegally siphon profits from the Subleasing PC Defendants; and (iii) the Management Defendants required Todd, Wesley Chiro, Balance Chiro, Sakini, Sacrum Chiro, Abakin, and ABA Chiro to issued prescriptions for medically unnecessary durable medical equipment as further payment for access to patients.

### C.    The Defendants' Fraudulent Treatment and Billing Protocol

93.    Once the Management Defendants arranged for the PC Defendants to have access to a steady stream of Insureds at the Clinics through illegal kickback and referral arrangements, the Defendants subjected the Insureds to a myriad of illusory and medically unnecessary healthcare services in order to maximize billing.

94.    Regardless of the nature of the accidents or the actual medical needs of the

Insureds, the Defendants purported to subject the Insureds to a pre-determined fraudulent treatment protocol – to the extent any services were performed at all – without regard for the Insureds' individual symptoms or presentment.

95.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

96.    No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. Rather, the Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.    The Fraudulent Charges for Initial Examinations Billed Through 713 Medicine, Paramount and MK Medical**

97.    As with the other Fraudulent Services, the Medical PC Defendants purported to provide the vast majority of the Insureds in the claims identified in Exhibits "1" – "3" with an initial examination pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

98.    The initial examinations essentially were performed as a "gateway" in order to provide Insureds with pre-determined "diagnoses" to allow the Defendants to bill for the laundry list of other Fraudulent Services, including physical therapy, EMG/NCV testing, pain management injections, ESWT, and OAT, as a springboard for the other Defendants and healthcare providers' services at the Clinics, and to provide a basis for the prescriptions issued by the Defendants,

including but not limited to prescriptions for pharmaceuticals, DME, and MRIs.

99.    To the extent that the initial examinations were conducted in the first instance, the Medical PC Defendants made a boilerplate, pre-determined "diagnosis" for the Insureds, upon which the Management Defendants and the Medical PC Defendants directed the Insureds to receive a pre-determined pattern of treatment, referrals, and recommendations to return for services at the Clinics.

100.    For example, regardless of the Insured's age, physical condition, nature of their accident, reported pain, or individual clinical need, one of the following boilerplate treatment plans routinely appeared in the initial examination report of the Medical PC Defendants:

**TREATMENT AND PLAN**
Treatment plan was proposed and thoroughly discussed with the patient. Upon reviewing patient agree with recommended treatment. Recommended and agreed upon treatment plan includes:
1. ___ Physical Therapy Program __5—Y__ times per week for four weeks until the next re-evaluation
2. ___ Outcome Assessment Narrative Summary
3. ___ Acupuncture
4. ___ Chiropractic therapy
5. ___ Physiatrist Consultation
6. ___ Orthopedic Consultation
7. ___ Psychological Evaluation
8. ___ Medications: Patient was advised to use current pain medications:
_____ Naproxen, Celopone, Fudexin _____

**TREATMENT AND PLAN**
Treatment plan was proposed and discussed with the patient. The patient elected to begin treatment as recommended. This treatment plan includes:
1. ___ Physical Therapy program __5—Y__ times per week for four weeks until the next re-evaluation:
2. ___ Computerized ROM and MMT treatment.
3. ___ Outcome Assessment Narrative Summary
4. ___ Physical capacity test
5. ___ Acupuncture
6. ___ Chiropractic
7. ___ Neurologist/Physiatrist consultation
8. ___ Orthopedic Consultation
9. ___ Psychological evaluation
10. ___ Medications: Patient was advised to use the current pain medications, muscle relaxants:
_____ Meloxicam 15 mg PO  Robaxin 75 mg po _____
Other: _____

101.    In addition to referring the patient for physical therapy, computerized "ROM and MMT treatment," OAT, acupuncture, chiropractic, neurologist or physiatrist consultation, orthopedic consultation, psychological evaluation, and prescribing pharmaceuticals, pursuant to illegal kickback arrangements, the Management Defendants and the Medical PC Defendants also routinely prescribed medically unnecessary pharmaceuticals, DME, and MRIs despite there being no legitimate symptoms for such prescriptions to justify the continued treatment of the patients and for financial gain.

102.    The Management Defendants and the Medical PC Defendants virtually always billed the "gateway" examinations, with pre-determined diagnoses and treatment plans, to GEICO under current procedural terminology ("CPT") code 99204, which virtually always resulted in a charge of $203.76 or $148.69.

103.    The Medical PC Defendants were not in compliance with relevant laws governing healthcare practice in New York and were not eligible to collect No-Fault Benefits in connection with any of the claims identified in Exhibits "1" – "3" for initial examinations, inasmuch as the examinations were unnecessary and were performed – to the extent they were performed at all – only because the Defendants gained access to Insureds at the Clinics by paying kickbacks, including to the John Doe Defendants, in violation of the No-Fault Laws.

104.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the severity of the Insureds' presenting problems and the nature and extent of the initial examinations.

105.    CPT code 99204 is described in the New York State Workers' Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, as:

Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A <u>comprehensive</u> history; A <u>comprehensive</u> examination; Medical decision making of <u>moderate</u> complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting <u>problem(s) are of moderate to high severity</u>. Physicians typically spend <u>45 minutes</u> face-to-face with the patient and/or family. (Emphasis added).

106.    Though the Management Defendants and the Medical PC Defendants billed for the initial examinations under CPT code 99204, no medical practitioner purportedly employed by or associated with the Medical PC Defendants ever spent 30 to 45 minutes, respectively, of face-to-face time with the Insureds or their families during the initial examinations. Rather, the initial examinations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

107.    In keeping with the fact that the initial examinations could not have lasted 30 to 45 minutes, the Medical PC Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

108.    All that was required to complete the boilerplate forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

109.    These interviews and examinations did not require any medical professional employed by or associated with the Medical PC Defendants to spend 30 to 45 minutes of face-to-face time with the Insureds.

110.    Additionally, according to the Fee Schedule, the use of CPT code 99204 typically requires that the Insured presented with problems of moderate-to-high severity.

111.    Though the Management Defendants and the Medical PC Defendants virtually always billed for the initial examinations under CPT code 99204, the Insureds did not present with problems of moderate-to-high severity as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

112.    Even though the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

113.    In addition, according to the Fee Schedule, when the Management Defendants and the Medical PC Defendants submitted charges for initial examinations under CPT code 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

(i)    Misrepresentations Regarding "Comprehensive" Patient Histories

114.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

115.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

116.    The CPT Assistant recognizes the following fourteen (14) organ systems with

respect to a review of systems: (i) constitutional symptoms (*e.g.*, fever, weight loss); (ii) eyes; (iii) ears, nose, mouth, throat; (iv) cardiovascular; (v) respiratory; (vi) gastrointestinal; (vii) genitourinary; (viii) musculoskeletal; (ix) integumentary (skin and/or breast); (x) neurological; (xi) psychiatric; (xii) endocrine; (xiii) hematologic/lymphatic; and (xiv) allergic/immunologic.

117.    When the Management Defendants and the Medical PC Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

118.    In fact, no healthcare professional associated with the Medical PC Defendants ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

119.    Rather, after purporting to provide the initial examinations billed under CPT code 99204, the Medical PC Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

120.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

(ii)    Misrepresentations Regarding "Comprehensive" Physical Examinations

121.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of

multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

122.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

123.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – *e.g.*, development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (*e.g.*, swelling, varicosities) and palpation (*e.g.*, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (*e.g.*, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

124.   When the Management Defendants and the Medical PC Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

125.   In fact, the Medical PC Defendants never conducted a general examination of multiple patient organ systems or conducted a complete examination of a single patient organ system, nor did they document findings with respect to at least eight organ systems.

126.   Furthermore, although the Medical PC Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – *e.g.*, development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (*e.g.*, swelling, varicosities) and palpation (*e.g.*, pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (*e.g.*, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making

127.    In addition, when the Management Defendants and the Medical PC Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

128.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

129.    Though the Medical PC Defendants falsely represented that their initial examinations involved medical decision-making of "moderate complexity", in actuality the initial examinations did not involve any legitimate, moderate complexity medical decision-making, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

130.    First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints to the extent that they ever had any complaints arising from automobile accidents at all.

131.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Medical PC

Defendants if properly administered, to the extent that the Medical PC Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

132.    Second, the Medical PC Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

133.    In fact, no healthcare professional associated with the Medical PC Defendants engaged in any medical decision-making at all. Rather, the putative results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to perform as well as the other services provided at the Clinics and then billed to GEICO.

134.    For example, the result of the Medical PC Defendants' initial examinations routinely included diagnoses of cervical, thoracic, and/or lumbar sprain and/or pain, to justify future charges for additional treatment.

135.    Additionally, as noted above, virtually all of the initial examinations included a treatment plan that checked off every treatment plan option for the Insured to receive the same laundry-list of services provided by the Defendants, other healthcare providers treating at the Clinics, and referrals for pharmaceuticals, DME, and/or MRIs.

136.    The Management Defendants and the Medical PC Defendants prescribed DME, pharmaceuticals, and other items, such as MRIs, to falsely document that the Insureds appear severely injured and to legitimize the other Fraudulent Services the Defendants purportedly performed and the other medical services Insureds received at the Clinics.

137.    In the claims for initial examinations identified in Exhibits "1" – "3," the Medical PC Defendants routinely falsely represented that the putative examinations involved medical

decision making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

138.    As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of the initial examinations was pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

**2.    The Fraudulent Charges for Follow-Up Examinations Billed Through 713 Medicine and MK Medical**

139.    As with the other Fraudulent Services, Kovalevskiy, 713 Medicine, and MK Medical the vast majority of Insureds in Exhibits "1" – "2" to one or more fraudulent follow-up examinations pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants and pursuant to the Defendants' illegal kickback and referral arrangements, rather than to provide genuine care to the Insureds.

140.    The Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical virtually always billed the follow-up examination to GEICO under CPT code 99214, typically resulting in a charge of $92.97 or $127.41.

141.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

142.    For example, CPT code 99214 requires a physician typically spend 25 minutes of face-to-face time with the Insured or the Insured's family. Here, however, no healthcare provider

associated with Kovalevskiy, 713 Medicine, or MK Medical spent any significant amount of time with the Insureds or their families during the follow-up examinations. Rather, as with the initial examinations, Kovalevskiy, 713 Medicine, or MK Medical did not actually provide any legitimate follow-up examination but instead issued boilerplate follow-up examination reports to further support the laundry-list of Fraudulent Services that the Defendants and the other healthcare providers at the Clinics purported to perform and then billed to GEICO and other insurers.

143.    Similar to the initial examination reports, and in keeping with the fact that the follow-up examinations were fraudulent, the purported "reports" generated by the Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical in connection with the putative follow-up examinations routinely checked off every treatment plan option for the Insured and/or prescribed additional pharmaceuticals.

144.    For example, one of the two following boilerplate notations would routinely appear in the follow-up examination reports:

**TREATMENT AND PLAN**
Treatment plan was proposed and thoroughly discussed with the patient. Upon reviewing patient agree with recommended treatment. Recommended and agreed upon treatment plan includes:
1. ___ Physical Therapy Program _2-3_ times per week for 4-5 weeks
2. ___ Outcome Assessment Narrative Summary
3. ___ Acupuncture
4. ___ Chiropractic therapy
5. ___ EMG/NCS of upper/lower extremities to r/o radiculopathy vs neuropathy
6. ___ Physiatrist Consultation
7. ___ Orthopedic Consultation
8. ___ Psychological Evaluation
9. ___ Medications: Patient was advised to use current pain medications: _____

**TREATMENT AND PLAN**

Treatment plan was proposed and thoroughly discussed with the patient. Upon reviewing patient agree with recommended treatment. Recommended and agreed upon treatment plan includes:

1. _____ Physical Therapy Program _3-4_ times per week for 4-5 weeks
2. _____ Outcome Assessment Narrative Summary
3. _____ Acupuncture
4. _____ Chiropractic therapy
5. _____ EMG/NCS of upper/lower extremities to r/o radiculopathy vs neuropathy
6. _____ PM&R Consultation
7. _____ Orthopedic Consultation
8. _____ Medications: Patient was advised to use current pain medications: _____

145.    Kovalevskiy, 713 Medicine, and MK Medical routinely prescribed the patient to continue with physical therapy multiple times per week for an additional four to five weeks, and referred the patient for OAT, acupuncture, chiropractic, EDX testing, pain management consultation, orthopedic consultation, psychological evaluation, psychiatrist consultation, and/or prescribed additional pharmaceuticals pursuant to the Defendants' illegal kickback and financial arraignments, referral schemes, and fraudulent treatment protocols.

146.    As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of the follow-up examinations was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

**3.    The Fraudulent Charges for ESWT Billed Through 713 Medicine, Paramount, and MK Medical**

147.    As with the other Fraudulent Services, Kovalevskiy, 713 Medicine, and MK Medical purported to provide the majority of the Insureds in the claims identified in Exhibits "1" – "3" with ESWT – which was, in reality, medically unnecessary, experimental, and non-reimbursable RPWT services – pursuant the Defendants' fraudulent treatment and billing

protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

148.    Neither Kovalevskiy nor any other licensed physician were ever involved in the performance or supervision of the ESWT.

149.    In keeping with the fact that Kovalevskiy did not provide virtually any of the ESWT, Kovalevskiy testified during the MK Medical Examination Under Oath on June 9, 2022 that he does not personally use the ESWT machine.  Instead, MK Medical outsources the work to technicians, including but not limited to Roman Monakhov and the company Terra MSR Inc., who charges MK Medical a daily fee for the ESWT technician services.

150.    In further keeping with the fact that Kovalevskiy did not provide virtually any of the EWST, Kovalevskiy testified during the 713 Medicine Examination Under Oath on April 20, 2023 that Roman Monakhov also performs the ESWT for 713 Medicine and Kovalevskiy is not in the room with Monakhov when he performs the purported ESWT.

151.    The Management Defendants and the Medical PC Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

152.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Medical PC Defendants purported to provide these Insureds to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

153.    In keeping with the fact that all of the Fraudulent Services identified in Exhibits "1" – "3" were medically unnecessary and were provided pursuant to pre-determined fraudulent protocols without the involvement of any physician involvement and solely to financially enrich the Defendants, the purported ESWT was documented on a generic "form" that intentionally avoided referencing Kovalevskiy and was virtually never signed by Kovalevskiy.  For example:





154.    Of consequence, the "notes" associated with the ESWT did not identify who performed the service. While all of the ESWT was performed by unlicensed technicians, virtually every bill submitted by the Management Defendants and the Medical PC Defendants for ESWT falsely represented Kovalevskiy performed the ESWT.

155.    Once documented by the unidentified technicians, the Management Defendants and the Medical PC Defendants then billed GEICO for ESWT through 713 Medicine, Paramount, and MK Medical using CPT code 0101T.

**CATEGORY III CODES**                                              **0042T–0504T**

**Medical Fee Schedule**                                           **Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

156.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set. Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

157.    Furthermore, the ESWT treatment allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.

158.    In the first instance, the charges were fraudulent in that the unlicensed technicians did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the Management Defendants arranged to have the unlicensed technicians perform

RPWT on the Insureds.

159.    RPWT involves the low energy delivery of compressed air and is incapable of generating a true shock wave. RPWT does not satisfy the requirements of CPT code 0101T, which requires a "high energy" shockwave.

160.    Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

161.    Notwithstanding its experimental nature, the Medical PC Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to the majority of Insureds, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Management Defendants and the Medical PC Defendants typically submitted a boilerplate, checklist treatment report that was not signed by either Kovalevskiy or the unlicensed technician, and the ESWT was routinely provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

162.    For example, the Medical PC Defendants routinely rendered ESWT to Insureds

less than twenty (20) days after their respective accidents, including the following examples:

(i)     The Medical PC Defendants purported to provide ESWT through Paramount to an Insured named JR on September 15, 2021, only 12 days after the Insured's accident on September 3, 2021.

(ii)    The Medical PC Defendants purported to provide ESWT through 713 Medicine to an Insured named RR on November 4, 2021, only nine days after the Insured's accident on October 26, 2021.  The Medical PC Defendants also purported to provide ESWT through 713 Medicine to RR on November 11, 2021, only 16 days after the Insured's accident;

(iii)   The Medical PC Defendants purported to provide ESWT through MK Medical to an Insured named TW on May 25, 2022, only 12 days after the Insured's accident on May 13, 2022;

(iv)    The Medical PC Defendants purported to provide ESWT through MK Medical to an Insured named SP on July 13, 2022, only ten days after the Insured's accident on July 3, 2022. The Medical PC Defendants also purportedly provided ESWT through MK Medical to SP on the following dates of services which were less than 20 days after SP's accident: July 19, 2022 and July 20, 2022;

(v)     The Medical PC Defendants purported to provide ESWT through MK Medical to an Insured named JC on August 24, 2022, only 12 days after the Insured's accident on August 12, 2022;

(vi)    The Medical PC Defendants purported to provide ESWT through 713 Medicine to an Insured named JG on October 6, 2022, only seven days after the Insured's accident on September 29, 2022;

(vii)   The Medical PC Defendants purported to provide ESWT through 713 Medicine to an Insured named SL on November 10, 2022, only 13 days after the Insured's accident on October 28, 2022;

(viii)  The Medical PC Defendants purported to provide ESWT through MK Medical to an Insured named ER on January 10, 2023, only nine days after the Insured's accident on January 1, 2023. The Medical PC Defendants also purportedly provided ESWT through MK Medical to ER on January 18, 2023, only 17 days after the Insured's accident;

(ix)    The Medical PC Defendants purported to provide ESWT through MK Medical to an Insured named NM on January 11, 2023, only five days after the Insured's accident on January 6, 2023. The Medical PC Defendants also purportedly provided ESWT through MK Medical to NM on the following dates of services which were less than 20 days after NM's accident: January 17, 2023, January 18, 2023, and January 24, 2023; and

(x)     The Medical PC Defendants purported to provide ESWT through 713 Medicine to an Insured named MV on May 25, 2023, only 13 days after the Insured's accident on May 12, 2023.

163.     These are only representative examples. Additionally, the Medical PC Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

(i)     On July 31, 2021, two Insureds – DG and JT – were involved in the same automobile accident. Thereafter, DG and JT sought treatment at the Nagle Ave Clinic, and each purportedly received ESWT from MK Medical, with DG purportedly receiving ESWT on August 27, 2021, September 7, 2021, and September 8, 2021, and JT purportedly receiving ESWT on September 8, 2021, September 17, 2021, November 9, 2021, December 1, 2021, December 22, 2021, February 16, 2022, and March 2, 2022.

(ii)     On October 15, 2021, three Insureds – MD, RG and AG – were involved in the same automobile accident. Thereafter, MD, RG, an AG sought treatment at the Nagle Ave Clinic, and each purportedly received ESWT from MK Medical, with MD purportedly receiving ESWT on November 17, 2021, November 23, 2021, December 1, 2021, and December 7, 2021, December 8, 2021, January 11, 2022, January 18, 2022, January 19, 2022, and January 26, 2022, RG purportedly receiving ESWT on November 17, 2021, November 23, 2021, December 1, 2021, December 7, 2021, December 8, 2021, December 15, 2021, December 22, 20221, January 5, 2022, and AG purportedly receiving ESWT on November 17, 2021, November 23, 2021, December 1, 2021, December 7, 2021, December 15, 2021, January 5, 2022, January 18, 2022, and January 19, 2022.

(iii)     On December 6, 2021, three Insureds – MM, CP and WA – were involved in the same automobile accident. Thereafter, MM, CP, and WA sought treatment at the Nagle Ave Clinic, and each purportedly received ESWT from MK Medical, with MM purportedly receiving ESWT on December 22, 2021, January 26, 2022, February 15, 2022, March 2, 2022, and March 30, 2022, CP purportedly receiving ESWT on December 22, 2021, January 26, 2022, February 23, 2022, March 2, 2022, and March 30, 2022, and WA purportedly receiving ESWT on December 29, 2021, January 4, 2022, January 26, 2022, February 9, 2022, February 15, 2022, February 23, 2022, March 21, 2022, and March 23, 2022.

(iv)     On August 17, 2021, two Insureds – MB and RC – were involved in the same automobile accident. Thereafter, MB and RC sought treatment at the Nagle Ave Clinic, and each purportedly received ESWT from MK Medical, with MB purportedly receiving ESWT on August 24, 2021, August 25, 2021, August 31, 2021, September 1, 2021, September 7, 2021, September 17, 2021, September 22,

2021, September 24, 2021, and September 28, 2021, and RC purportedly receiving ESWT on August 31, 2021, September 24, 2021, November 2, 2021, December 8, 2021, and January 5, 2022.

(v)     On April 30, 2022, three Insureds – JA, SS and AP – were involved in the same automobile accident. Thereafter, JA, SS, and AP sought treatment at the Roosevelt Ave Clinic, and each purportedly received ESWT from 713 Medicine, with JA purportedly receiving ESWT on October 6, 2022 and November 10, 2022, SS purportedly receiving ESWT on October 6, 2022 and October 13, 2022, and AP purportedly receiving ESWT on October 6, 2022 and October 13, 2022.

(vi)    On May 26, 2022, two Insureds – MA and GL – were involved in the same automobile accident. Thereafter, MA and GL sought treatment at the Roosevelt Ave Clinic, and each purportedly received ESWT from 713 Medicine, with MA purportedly receiving ESWT on September 29, 2022 and October 13, 2022, and GL purportedly receiving ESWT on  September 15, 2022, September 22, 2022, September 29, 2022, and November 10, 2022.

(vii)   On September 10, 2022, four Insureds –  DB, KB, FP and RG – were involved in the same automobile accident. Thereafter, DB, KB, FP, and RG sought treatment at the Nagle Ave Clinic, and each purportedly received ESWT from MK Medical, with DB purportedly receiving ESWT on October 4, 2022, October 5, 2022, October 18, 2022 and October 26, 2022, KB purportedly receiving ESWT on October 4, 2022, October 11, 2022, October 12, 2022, and October 18, 2022, FP purportedly receiving ESWT on October 18, 2022, October 26, 2022, and December 6, 2022, and RG purportedly receiving ESWT on October 5, 2022, October 18, 2022, November 1, 2022, and November 29, 2022.

(viii)  On October 27, 2022, three Insureds – TG, RG and NS – were involved in the same automobile accident. Thereafter, TG, RG, and NS sought treatment at the Roosevelt Ave Clinic, and each purportedly received ESWT from 713 Medicine, with TG purportedly receiving ESWT on November 10, 2022, December 1, 2022, March 2, 2023, and April 27, 2023, RG purportedly receiving ESWT on December 1, 2022 and April 18, 2023, and NS purportedly receiving ESWT on November 10, 2022.

(ix)    On April 8, 2023, two Insureds – CA and AY – were involved in the same automobile accident. Thereafter, CA and AY sought treatment at the Roosevelt Ave Clinic, and each purportedly received ESWT from 713 Medicine, with CA purportedly receiving ESWT on June 1, 2023, September 7, 2023 and September 21, 2023, and with AY purportedly receiving ESWT on May 4, 2023, June 1, 2023, and July 20, 2023.

(x)     On July 8, 2023, two Insureds –RI and DV – were involved in the same automobile accident. Thereafter, RI and DV sought treatment at the Roosevelt Ave Clinic, and each purportedly received ESWT from 713 Medicine, with RI

and DV both purportedly receiving ESWT on August 17, 2023, September 21, 2023, September 28, 2023, and October 5, 2023.

164.    These are only representative examples. In all the claims for ESWT identified in Exhibits "1" – "3," the Medical PC Defendants falsely represented that the ESWT "treatments" were medically necessary, when, in fact, they were not medically necessary for each Insured, were provided pursuant to predetermined fraudulent protocols, and were, therefore, not eligible for reimbursement.

165.    In keeping with the fact that the Medical PC Defendants rendered the ESWT "treatments" pursuant to a fraudulent pre-determined treatment protocol, the ESWT "treatments" that the Medical PC Defendants allegedly performed were not tailored to any individual Insured's particular circumstances, and virtually none of the medical records submitted by the Management Defendants and the Medical PC Defendants contain any patient-specific assessment of the Insureds' response to such "treatments."

166.    Upon information and belief, the RPWT machines used by the Medical PC Defendants had a range of pressure intensity, pulse, and frequency settings. These settings ostensibly exist so that the treatment can be tailored to the needs of each individual patient.

167.    Yet, the ESWT testing forms that the Management Defendants and the Medical PC Defendants submitted for the overwhelming majority of Insureds only noted which parts of the body were treated with ESWT, including but not limited to simply checking off "Cervical Spine" or "Lumbar Spine" to indicate the ESWT rendered to the Insured.

168.    As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of ESWT was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements,

and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

4.    **The Fraudulent Charges for Electrodiagnostic Testing (NCV/EMG) Billed Through 713 Medicine and MK Medical**

169.    As with the other Fraudulent Services, and based upon the fraudulent, pre-determined "diagnoses" that they purported to provide to Insureds during the purported examinations, Kovalevskiy, 713 Medicine, and MK Medical purported to subject many of the Insureds in the claims identified in Exhibits "1"-"2" to a series of medically unnecessary electrodiagnostic tests, specifically NCV and EMG tests (collectively, the "electrodiagnostic" or "EDX" tests) pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

170.    In addition to examinations, the Management Defendants, Kovalevskiy and MK Medical also submitted many charges for purported initial consultations on the same day as the EDX tests purportedly performed by MK Medical under CPT code 99244 for $324.69, all of which misrepresented the nature and extent of the initial consultations, misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families, and which were medically unnecessary.

a.    The Human Nervous System and Electrodiagnostic Testing

171.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

172.    Two primary functions of the nervous system are to collect and relay sensory

information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

173.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

174.    The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

175.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, loss of muscle control, and alteration of reflexes.

176.    EMG tests and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

177.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

178.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional

medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

        b.    <u>The Fraudulent NCVs</u>

179.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

180.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude") and calculates the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

181.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

182.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

183.    F-wave and H-reflex studies are additional types of NCV tests that may be performed in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a

limb.

184.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of two sensory nerves; (ii) NCV tests of three motor nerves; and (iii) two H-reflex studies.

185.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Medical PC Defendants purported to perform testing on far more nerves than recommended by the Recommended Policy for virtually all of the Insureds.

186.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, the Management Defendants and the Medical PC Defendants billed for NCV tests for 13 or more nerves under CPT code 95913 for virtually every EDX test, including purportedly performing multiple EDX tests for the majority of these patients which purported to include the following for the patient: (i) NCV tests of 10 or more sensory nerves; (ii) NCV tests of 8 or more motor nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies.

187.    For example:

(i)     On October 13, 2020 and October 26, 2020, MK Medical purported to provide EDX tests to an Insured named JU. During these EDX tests, MK Medical purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(ii)    On October 13, 2020 and November 23, 2020, MK Medical purported to provide EDX tests to an Insured named AA. During these EDX tests, MK Medical purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(iii)   On September 9, 2021 and September 20, 2021, MK Medical purported to provide EDX tests to an Insured named JR. During these EDX tests, MK Medical purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management

Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(iv)     On February 10, 2022 and March 17, 2022, MK Medical purported to provide EDX tests to an Insured named FP. During these EDX tests, MK Medical purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(v)      On January 20, 2022 and February 3, 2022, MK Medical purported to provide EDX tests to an Insured named HP. During these EDX tests, MK Medical purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(vi)     On January 20, 2022 and February 3, 2022, 713 Medicine purported to provide EDX tests to an Insured named KG. During these EDX tests, 713 Medicine purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(vii)    On December 28, 2022 and January 25, 2023, 713 Medicine purported to provide EDX tests to an Insured named FD. During these EDX tests, 713 Medicine purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(viii)   On March 7, 2022 and March 23, 2022, 713 Medicine purported to provide EDX tests to an Insured named XW. During these EDX tests, 713 Medicine purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(ix)     On May 16, 2022 and June 8, 2022, 713 Medicine purported to provide EDX tests to an Insured named OS. During these EDX tests, 713 Medicine purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

(x)      On December 20, 2022 and December 28, 2022, 713 Medicine purported to

provide EDX tests to an Insured named SL. During these EDX tests, 713 Medicine purported to provide: (i) ten sensory nerve NCV tests; (ii) eight motor nerve NCV tests with F-wave studies; and (iii) two H-reflex studies. The Management Defendants and the Medical PC Defendants then billed GEICO over $1,300.00 for these tests through MK Medical.

188.    As of October 1, 2020, when changes to the Fee Schedule went into effect for New York no-fault insurance claims, the Fee Schedule requires providers to submit billing for NCV testing under one CPT code based on the number of nerves tested.  For example, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit a maximum charge of $653.46 under CPT code 95913 for NCV testing of 13 or more nerves.

189.    Kovalevskiy, 713 Medicine, and MK Medical routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds have radiculopathies or any other medical condition.

190.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

191.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

192.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

193.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

194.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

195.    Even so, Kovalevskiy, 713 Medicine, and MK Medical did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

196.    Instead, the Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical applied a fraudulent "protocol" whereby Kovalevskiy, 713 Medicine, and MK Medical routinely purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers for the Insureds identified in Exhibits "1" – "2" that received EDX testing. Specifically, Kovalevskiy, 713 Medicine, and MK Medical routinely purported to test the following identical peripheral nerves and nerve fibers, regardless of any particular Insured's individual symptoms: (i) left and right median motor nerves; (ii) left and right ulnar motor nerves; (iii) left and right peroneal motor nerves; (iv) left and right median tibial motor nerves; (v) left and right radial sensory nerves; (vi) left and right ulnar sensory nerves; (vii) left and right median sensory nerves; (viii) left and right sural sensory nerves; and (ix) left and right peroneal sensory nerves.

197.    Additionally, though Kovalevskiy, 713 Medicine, and MK Medical's NCV tests are allegedly provided to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, the NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment

protocol designed to maximize the billing that could be submitted for each Insured.

        c.    <u>The Fraudulent EMG Tests</u>

198.    Kovalevskiy, 713 Medicine, and MK Medical also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

199.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

200.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

201.    Kovalevskiy, 713 Medicine, and MK Medical purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies. In actuality, the EMGs were provided – to the extent they were provided at all – as part of the Defendants' pre-determined fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

202.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time

results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

203. As with their NCV tests, Kovalevskiy, 713 Medicine, and MK Medical did not tailor the EMGs they purported to perform to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

204. Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that Kovalevskiy, 713 Medicine, and MK Medical purported to provide and/or perform grossly exceeded the maximum number of limbs tested – *i.e.*, EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy because Kovalevskiy, 713 Medicine, and MK Medical purported to provide and/or perform EMGs on all four limbs on the majority of Insureds, in excess and contravention of the Recommended Policy, solely to maximize the profits that they could reap from each Insured.

205. Not only did Kovalevskiy, 713 Medicine, and MK Medical routinely purport to provide four-limb EMGs to Insureds, but they also routinely acted to conceal the excessive number of EDX tests that they purported to provide to Insureds.

206. EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

207. Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed on a single date.

208. This concept is set forth in the Recommended Policy, which states that "[i]t is

appropriate for only 1 attending physician to perform or supervise all of the components of the EDX tests (*e.g.*, history taking, physical evaluation, supervision and/or performance of the EDX test, and interpretation) for a given patient and for all the testing to occur on the same date of service."

209.    Even so, in order to conceal the fact that they routinely billed for an excessive number of EDX tests for many Insureds, and to maximize the number of charges submitted for the NCV portion of the test, Kovalevskiy, 713 Medicine, and MK Medical routinely required the Insureds to return for EDX tests on two separate dates of service, and then split their charges for the EDX tests onto two separate bills.

210.    For example:

(i)     MK Medical purported to provide to an Insured named RT: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – May 6, 2021 and May 27, 2021 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii)    MK Medical purported to provide to an Insured named JT: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four limb EMGs over the course of two separate dates of service – June 17, 2021 and July 1, 2021 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii)   MK Medical purported to provide to an Insured named AW: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four limb EMGs over the course of two separate dates of service – July 19, 2021 and July 29, 2021 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv)    713 Medicine purported to provide to an Insured named JR: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – November 15, 2021 and November 29, 2021 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(v)     MK Medical purported to provide to an Insured named RA: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four limb EMGs over the course

of two separate dates of service – February 10, 2022 and March 17, 2022 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(vi)    713 Medicine purported to provide to an Insured named DAP: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – September 21, 2022 and October 4, 2022 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii)    713 Medicine purported to provide to an Insured named AC: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – May 9, 2023 and May 23, 2023 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii)    713 Medicine purported to provide to an Insured named PS: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – June 14, 2023 and July 12, 2023 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix)    MK Medical purported to provide to an Insured named GD: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four limb EMGs over the course of two separate dates of service – July 13, 2023 and July 27, 2023 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

(x)    713 Medicine purported to provide to an Insured named JN: (i) NCV tests of ten sensory nerves and eight motor nerves; and (ii) four EMGs over the course of two separate dates of service – September 13, 2023 and October 11, 2023 – and then split the charges for the EDX tests on two separate bills in order to conceal the excessive, medically unnecessary testing.

211.    These are only representative samples. In the claims for EDX tests identified in Exhibits "1" - "2," Kovalevskiy, 713 Medicine, and MK Medical routinely and unnecessarily subjected the Insureds to EDX tests on separate dates of service, and split the EDX test charges onto separate bills, to conceal the fact that they were purporting to provide an excessive and unnecessary number of EDX tests to the Insureds.

212.    In keeping with the fact that the purported EMG tests were medically useless, the

putative "results" of Kovalevskiy, 713 Medicine, and MK Medical's EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

213.     As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of EDX testing was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

### 5.     The Fraudulent Charges for OAT Billed Through 713 Medicine, Paramount, and MK Medical

214.     As with the other Fraudulent Services, Kovalevskiy, 713 Medicine, and MK Medical purported to provide medically useless or otherwise illusory OAT to the vast majority of the Insureds in Exhibits "1" – "2," on or about the same dates the Medical PC Defendants purported to subject the Insureds to initial or follow-up examinations, pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

215.     The Management Defendants and the Medical PC Defendants then billed the OAT to GEICO through 713 Medicine, Paramount, and MK Medical using CPT code 99358, virtually always resulting in a charge of $280.12 for each round of "testing."

216.     The OAT that the Medical PC Defendants purportedly provided to Insureds – to the extent provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact

of those symptoms on their daily lives.

217.    Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the OAT that the Medical PC Defendants purportedly provided were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the OAT should have been reimbursed as an element of the initial and follow-up examinations.

218.    In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination and then bill separately, or additionally, for contemporaneously-provided OAT either using CPT code 99358 or by submitting charges for examinations in excess of the Fee Schedule.

219.    Even so, the Management Defendants and the Medical PC Defendants routinely billed GEICO for patient examinations and supposedly-contemporaneously-provided OAT for a single Insured on a single date of service including, for example, for the following Insureds on the following dates:

(i)      RJ through MK Medical on September 9, 2021 and October 21, 2021;

(ii)     MC through MK Medical on September 14, 2021 and November 2, 2021;

(iii)    SA through MK Medical on September 20, 2021 and November 2, 2021;

(iv)     MC through Paramount on September 21, 2021;

(v)      EM through MK Medical on September 23, 2021 and October 21, 2021;

(vi)     DU through 713 Medicine on October 5, 2021;

(vii)    WA through MK Medical on October 14, 2021 and December 2, 2021;

(viii)   MA through 713 Medicine on October 18, 2021;

(ix)     EA through MK Medical on August 30, 2022 and December 29, 2022;

(x)    LA through MK Medical on November 16, 2023.

220.    These are only representative examples.

221.    In the claims for purported OAT identified in Exhibits "1" – "3," the Management Defendants and the Medical PC Defendants routinely and fraudulently billed GEICO for patient examinations and supposedly-contemporaneously-provided OAT for a single Insured on a single date of service.

222.    Even if the Medical PC Defendants did perform the OAT for which GEICO was billed, the information gained through the use of the tests would not have been significantly different from the information that the Medical PC Defendants purported to obtain during virtually every Insured's initial and follow-up patient history and examinations. In fact, the Medical PC Defendants, in virtually all of its billing for fraudulent initial and follow-up examinations, represented that Kovalevskiy took at least a "detailed" if not "comprehensive" patient history and performed at least a "detailed" if not "comprehensive" physical examination.

223.    The OAT represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examinations and follow-up examinations. The OAT were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

224.    The Management Defendants and the Medical PC Defendants' use of CPT code 99358 to bill for the OAT also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some

prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

225.    Though the Management Defendants and the Medical PC Defendants routinely submitted billing under CPT code 99358 for OAT, no physician associated with the Medical PC Defendants spent an hour reviewing or administering the tests or communicating with the Insureds or their families.

226.    Indeed, the OAT did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

227.    Neither Kovalevskiy nor any other physician supposedly associated with 713 Medicine, Paramount, or MK Medical had any meaningful involvement in the provision of the purported OAT.

228.    As the OAT were medically unnecessary and were performed pursuant to the Defendants' pre-determined fraudulent treatment protocol and illegal kickback scheme, the results of the OAT like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**6.    The Fraudulent Charges for Physical Therapy Treatment Billed Through 713 Medicine, Paramount, and MK Medical**

229.    As with the other Fraudulent Services, the Medical PC Defendants purported to provide  medically unnecessary physical therapy services to virtually every Insured in Exhibits "1" – "3" pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

230.    Specifically, as a result of the bogus diagnoses in the fraudulent initial

examinations and follow-up examinations performed by the Medical PC Defendants, virtually every Insured was referred for a course of physical therapy that involved nearly identical treatment plans consisting of the same physical therapy modalities being rendered several times per week for several months.

231.    Through this boilerplate treatment and billing protocol, the Medical PC Defendants, at the direction of the Management Defendants, purported to provide virtually the same charges for every date on which every Insured purportedly received physical therapy services.

232.    Specifically, the Medical PC Defendants purported to render and submitted bills to GEICO for the following modalities for virtually every Insured on every date of service: (i) application of hot packs, billed under CPT code 97010; (ii) 15 minutes of therapeutic exercises, billed under CPT code 97110; and (iii) electrical stimulation therapy, billed under CPT code 97014.

233.    As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of physical therapy was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

**7.    The Fraudulent Charges for Trigger Point Injections Billed Through 713 Medicine and MK Medical**

234.    As with the other Fraudulent Services, Kovalevskiy, 713 Medicine, and MK Medical routinely purported to provide the Insureds in Exhibits "1" – "2" with medically unnecessary trigger point injections pursuant the Defendants' fraudulent treatment and billing

protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

235.    The purpose of these medically unnecessary injections was to enrich the Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical, as the injections were performed regardless of the Insureds' symptoms or complaints.

236.    The Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical then billed the trigger point injections to GEICO through 713 Medicine and MK Medical under CPT codes 20553, generally resulting in charges of $131.01 for each round of trigger point injections that they purported to provide.

237.    All of the billing submitted to GEICO by the Management Defendants, Kovalevskiy, 713 Medicine, MK Medical for the putative trigger point injections represented that Kovalevskiy performed each and every billed-for injection.

238.    Like the charges for the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for the trigger point injections were purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

(i)    Legitimate Use of Trigger Point Injections

239.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of

factors, including direct muscle injuries sustained in automobile accidents.

240.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

241.    Any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

242.    In a legitimate trigger point treatment, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

243.    In a legitimate trigger point treatment, trigger point injections should not be administered more than once every two months, or more than six times in any given year. This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; and (ii) if a patient's pain is not relieved through the injections, the pain may be caused by something other than a trigger point, and the perpetuating factors of the pain must be identified and managed.

(ii)    <u>Kovalevskiy, 713 Medicine, and MK Medical's Medically Unnecessary Trigger Point Injections Under Ultrasound Guidance</u>

244.    Kovalevskiy, 713 Medicine, and MK Medical typically did not wait until any Insured failed conservative therapies before purporting to provide trigger point injections, because conservative therapy is not sufficiently remunerative to parties involved in a fraud scheme.

245.    Instead, Kovalevskiy, 713 Medicine, and MK Medical frequently purported to provide trigger point injections to Insureds – including Insureds who were involved in the same

motor vehicle accident and who both ended up purportedly treating at the same Clinic – within the first week or two, and often <u>within days</u>, after the Insureds' automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month.

246.    For example:

(i)    On November 12, 2021, an Insured named MD was involved in an automobile accident. Just four days later, on November 16, 2021, MK Medical purported to provide a trigger point injection to BM, despite the fact that MD could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(ii)    On April 18, 2022, an Insured named BM was involved in an automobile accident. Just three days later, on April 21, 2022, MK Medical purported to provide a trigger point injection to BM, despite the fact that BM could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(iii)    On May 26, 2022, an Insured named MA was involved in an automobile accident. Just six days later, on June 1, 2022, 713 Medicine purported to provide a trigger point injection to MA, despite the fact that MA could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(iv)    On September 20, 2022, an Insured named MR was involved in an automobile accident. Just seven days later, on September 27, 2022, 713 Medicine purported to provide a trigger point injection to MR, despite the fact that MR could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(v)    On March 8, 2023, an Insured named HM was involved in an automobile accident. Just one day later, on March 9, 2023, MK Medical purported to provide a trigger point injection to HM, and just eight days later, on March 16, 2023, MK Medical purported to provide another trigger point injection to HM, despite the fact that HM could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(vi)    On March 30, 2023, an Insured named AU was involved in an automobile accident. Just six days later, on April 5, 2023, 713 Medicine purported to provide a trigger point injection to AU, despite the fact that AU could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(vii)    On May 26, 2023, an Insured named YV was involved in an automobile accident. Just six days later, on June 1, 2023, MK Medical purported to provide a trigger point injection to YV, despite the fact that YV could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(viii)    On July 26 2023, an Insured named MP was involved in an automobile accident. Just one day later, on July 27, 2023, MK Medical purported to provide a trigger point injection to MP, despite the fact that MP could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(ix)    On October 26, 2023, an Insured named MM was involved in an automobile accident. Just six days later, on November 1, 2023, 713 Medicine purported to provide a trigger point injection to MM, despite the fact that MM could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

(x)    On November 27, 2023, an Insured named JP was involved in an automobile accident. Just two days later, on November 29, 2023, 713 Medicine purported to provide a trigger point injection to JP, and just nine days later after the motor vehicle accident, on December 6, 2023, 713 Medicine purported to provide another trigger point injection to JP, despite the fact that JP could not have – by that point – experienced "persistent" pain symptoms or failed a course of conservative therapy.

247.    These are only representative examples. In the claims for trigger point injections identified in Exhibits "1" – "2," Kovalevskiy, 713 Medicine, and MK Medical frequently purported to provide trigger point injections to Insureds within the first week or two – and often within days – after the Insureds' automobile accidents, before the Insureds could have had pain symptoms that persisted for more than three months and before the Insureds could have failed or been intolerant of conservative therapies for at least one month.

248.    Moreover, to further increase the amount of fraudulent billing they could submit to GEICO and other insurers, for the vast majority of patients who purportedly received a trigger point injection, the Management Defendants, Kovalevskiy, 713 Medicine, and MK Medical submitted a separate charge under CPT code 76942 at a charge of $289.20 for supposed

"ultrasound guidance" used in the provision of the medically unnecessary trigger point injections.

249.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' profits and Kovalevskiy, 713 Medicine, and MK Medical's billing rather than to treat the Insureds who supposedly were subjected to it.

250.    In fact, in a legitimate clinical setting, trigger point injections may be provided in an office setting, and do not require the use of ultrasound guidance.

251.    In fact, there is virtually no supportive scientific evidence for the use of ultrasound guidance in conjunction with routine in-office trigger point injections.

252.    As with the other Fraudulent Services, the Management Defendants' and the Medical PC Defendants' billing for and alleged performance of trigger point injections and ultrasound guidance was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

**8.    The Fraudulent Chiropractic Services Billed Through Balance Chiro, Active Chiro, and Wesley Chiro**

253.    As with the other Fraudulent Services, Todd, Balance Chiro, Active Chiro, Wesley Chiro, Abakin, ABA Chiro, Abakin, and Sacrum Chiro (collectively, the "Chiropractor Defendants") subjected Insureds to a course of medically unnecessary chiropractic services pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich

the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

254.    Todd purported to provide virtually all of the chiropractic services on behalf of Balance Chiro and Active Chiro to the Insureds in Exhibit "4" and Exhibit "5" and purported to provide many of the services on behalf of Wesley Chiro to the Insureds in Exhibit "6."

255.    Abakin purported to provide virtually all of the chiropractic services on behalf of ABA Chiro to the Insureds in Exhibit "7."

256.    Sakini purported to provide many of the chiropractic services on behalf of Sacrum Chiro to the Insureds in Exhibit "8."

(i)    The Fraudulent Chiropractic Examinations

257.    Pursuant to the Defendants' fraudulent predetermined treatment and billing protocol, the Medical PC Defendants referred the vast majority of the Insureds to the Chiropractor Defendants for chiropractic services, including the fraudulent initial chiropractic examinations that the Chiropractor Defendants rendered to the vast majority of the Insureds.

258.    The Management Defendants and the Chiropractic Defendants virtually always billed the initial chiropractic examinations to GEICO under CPT codes 99202 or 99203.

259.    The charges for the initial chiropractic examinations were fraudulent in that the initial chiropractic examinations were medically unnecessary and were performed pursuant to the kickbacks that the Chiropractor Defendants paid at the Clinics in coordination with the Management Defendants and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

260.    The charges for the initial chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the

amount of time spent on the examinations; (iii) misrepresented the extent of the examinations allegedly performed; and (iv) misrepresented the extent of the medical decision-making during the examinations.

261.     Furthermore, the charges for the initial chiropractic examinations under CPT codes 99202 and 99203 were fraudulent in that they misrepresented the extent of the initial chiropractic examinations.

262.     For example, in every claim identified in Exhibits "4" – "8" for initial chiropractic examinations under CPT codes 99202 and 99203, the Management Defendants and the Chiropractic Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor spent with the Insureds or the Insureds' families.

263.     The use of CPT code 99202 typically requires that a chiropractor spend 20 minutes of face-to-face time with the Insured or the Insured's family.

264.     The use of CPT code 99203 typically requires a chiropractor to spend 30 minutes of face-to-face time with the Insured or the Insured's family.

265.     Though the Management Defendants and the Chiropractor Defendants billed for virtually all of the chiropractic examinations under CPT codes 99202 and 99203, no chiropractor or other healthcare professional associated with the Chiropractor Defendants spent 20 minutes, let alone 30 minutes, on an initial chiropractic examination.

266.     Rather the initial chiropractic examinations in the claims identified in Exhibits "4" – "8" rarely lasted more than 10-15 minutes.

267.     In keeping with the fact that the initial chiropractic examinations rarely lasted more than 10-15 minutes, the Chiropractor Defendants used checklist forms in purporting to conduct the initial chiropractic examinations.

268.     The checklist forms and documents that the Chiropractor Defendants used in conducting the initial chiropractic examinations set forth a limited range of potential patient complaints examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

269.     All that was required to complete the checklist forms and documents was a brief patient interview and a perfunctory physical examination of the Insureds.

270.     These interviews and examinations did not require the Chiropractor Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds during the putative initial chiropractic examinations.

271.     In addition, pursuant to the Fee Schedule, when the Chiropractor Defendants submitted charges for initial chiropractic examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a chiropractor associated with one of the Chiropractor Defendants: (i) took a "detailed" patient history; and (ii) conducted a "detailed" physical examination.

a.     Misrepresentations Regarding "Detailed" Patient Histories

272.     Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician or chiropractor take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

273.     However, in the claims for initial chiropractic examinations identified in Exhibits "4" – "8," the Chiropractic Defendants, never took a "detailed" patient history from Insureds during the initial chiropractic examinations, inasmuch as they did not take a history of systems related to the patient's presenting problems and did not conduct any review of a limited number of additional systems.

274.    Rather, after purporting to provide the initial chiropractic examinations, the Chiropractor Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

275.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii) Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

b.    Misrepresentations Regarding "Detailed" Physical Examinations

276.    Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

277.    To the extent that the Insureds in the claims identified in Exhibits "4" – "8," had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

278.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the following:

279.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to the

following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (*e.g.*, development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (*e.g.*, swelling, varicosities) and palpation (*e.g.*, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (*e.g.*, scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

280.    In the claims for initial chiropractic examinations in Exhibits "4" – "8" in which the Chiropractor Defendants billed for the initial chiropractic examinations under CPT code 99203, the Chiropractor Defendants falsely represented that they conducted a "detailed" patient examination of the Insureds they purported to treat during the initial chiropractic examinations.

281.    In fact, the Chiropractor Defendants never conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

282.    In addition to the fraudulent initial chiropractic examinations, the Chiropractor

Defendants purported to subject the majority of the Insureds in Exhibits "4" – "8" to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

283. The Management Defendants and the Chiropractor Defendants virtually always billed the follow-up examinations to GEICO under CPT code 99212.

284. As with the other Fraudulent Services, the Management Defendants and the Chiropractor Defendants' charges for the follow-up examinations were performed pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

(ii)    The Fraudulent Chiropractic Treatment

285. As with the other Fraudulent Services, following the fraudulent chiropractic examinations, the Chiropractor Defendants routinely purported to provide Insureds with months of chiropractic manipulation therapy that was billed primarily under CPT code 98940 and/or 98941 pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

286. Insureds were generally subjected to multiple sessions of chiropractic manipulation therapy per week over a period of several months, resulting in hundreds of dollars of charges for each Insured. The purported results of the other Fraudulent Services (*i.e.*, medical examinations and chiropractic examinations) were used by the Defendants as justification for continued rounds of chiropractic manipulation therapy despite the fact the Chiropractic Defendants never incorporated the so-called "findings" of the other Defendants or the results of

the other Fraudulent Services into the chiropractic manipulation therapy.

287.    Nor was there ever any meaningful assessment or modification of the chiropractic manipulation therapy as a result of the other Defendants' findings or the other Fraudulent Services.    In fact, the Chiropractic Defendants virtually never meaningfully modified an Insured's chiropractic care regardless of the individual symptoms or actual response to the treatment.

288.    In keeping with the fact that the Chiropractic Defendants submitted bills to GEICO as part of a fraudulent scheme to generate profits, in addition to routinely purportedly providing Insureds with chiropractic manipulation multiple times per week for several months, the Chiropractic Defendants also purported to render additional medically unnecessary services to Insureds, including: (i) Todd, Balance Chiro, and Active Chiro and Sakini and Sarcum Chiro billing under CPT code 97139 for "myofascial trigger point therapy;" (ii) Tood and Wesley Chiro and Sakini and Sacrum Chiro billing under CPT code 97124 for "massage" and CPT code 97012 for "traction;" and (iii) Abakin and ABA Chiro billing under CPT code 97112 for "neuromuscular reeducation."

289.    Additionally, regarding ABA Chiro billing under CPT code 97112 for "neuromuscular reeducation", genuine neuromuscular re-education is used to re-educate and re-train a body part to perform a function/task that the body part absolutely was ready to do in its pre-injury state. This might include, for example, re-teaching the hand to twist a door knob or grasp a cup.

290.    Broadly speaking, neuromuscular re-education is used following a neurological trauma such as a stroke.

291.    Neuromuscular re-education, most assuredly, is not medically necessary to treat

muscle strains, sprains, soft tissue injuries, or injuries of a similar nature.

292.    Neuromuscular re-education may be considered medically necessary if at least one of the following conditions is present and documented:

(i)    The Insured has the loss of deep tendon reflexes and vibration sense accompanied by paresthesia, burning, or diffuse pain of the feet, lower legs, and/or fingers; or

(ii)    The Insured has nerve palsy, such as peroneal nerve injury causing foot drop; or

(iii)    The Insured has muscular weakness, spasticity, or flaccidity as a result of a cerebral dysfunction, a nerve injury or disease, or has had a spinal cord disease or trauma.

293.    Virtually none of the Insureds purportedly treated by Abakin and ABA Chiro presented with any of the aforementioned prerequisites, which would justify neuromuscular re-education services.

294.    Given the specific type of injury that neuromuscular re-education is meant to treat, there is no way that this many Insureds needed this treatment as a result of the relatively minor, fender-bender accidents that the Insureds purportedly sustained.

295.    Moreover, Abakin and ABA Chiro submitted billing for purported neuromuscular re-education together with billing for standard chiropractic manipulations and treatments on each treatment visit, in violation of the Fee Schedule, and did so repeatedly, despite the daily reimbursement limits applicable to CPT codes 97112, 98940, and 98941, when these codes are billed for procedures and/or modalities performed on the same day.

296.    Pursuant to the Fee Schedule, Abakin and ABA Chiro are limited to a maximum reimbursement of 8 "relative value units" where neuromuscular re-education and chiropractic treatments are performed on the same day, but Abakin and ABA Chiro consistently submitted billing seeking more than the 8 relative value units per day, all in an effort to collect fees from GEICO and other New York automobile insurers over and above the maximum permissible

charges allowable under the Fee Schedule.

297.    The months of continued unchanging fraudulent chiropractic treatments that were routinely performed on the Insureds were not based on medical necessity and not intended to resolve the complaints/symptoms of the Insureds. Instead, the "protocol" approach to the performance of the fraudulent chiropractic treatments was designed solely to maximize the charges that the Chiropractor Defendants could submit to GEICO, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol.

298.    As with the other Fraudulent Services, the Management Defendants' and the Chiropractor Defendants' billing for and alleged performance of chiropractic was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

**9.    The Fraudulent Physical Therapy Servies Billed Through Elmont PT**

299.    As with the other Fraudulent Services, Ahmed and Elmont PT purportedly provided medically unnecessary physical therapy services the Insureds in Exhibit "9" pursuant the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, the Defendants' illegal kickback and referral arrangements, and the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

300.    Specifically, as a result of the bogus diagnoses in the fraudulent initial examinations and follow-up examinations purportedly performed by Kovalevskiy and 713 Medicine, as well as in the fraudulent initial examinations purportedly performed by Ahmed and

Elmont PT, virtually every Insured in Exhibit "9" was referred for a course of physical therapy that involved nearly identical treatment plans consisting of the same physical therapy modalities being rendered several times per week for several months.

301.    Through this boilerplate treatment and billing protocol, Ahmed and Elmont PT, at the direction of the Management Defendants, purported to provide virtually the same charges for every date on which every Insured purportedly received physical therapy services.

302.    Specifically, Ahmed and Elmont PT purported to render for the following modalities for virtually every Insured on every date of service: (i) application of hot or cold packs, billed under CPT code 97010; (ii) 15 minutes of therapeutic exercises, billed under CPT code 97110; and (iii) electrical stimulation therapy, billed under CPT code 97014.

303.    Ahmed and Elmont PT, at the direction of the Management Defendants, purported to provide this identical physical therapy treatment plan to virtually every Insured in order to submit as much billing as possible for physical therapy services.

304.    To maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, and pursuant to the Defendants' fraudulent treatment and billing protocol and the improper referral and financial arrangements amongst the Defendants, Ahmed and Elmont PT also purported to subject many Insureds in Exhibit "9" to physical performance testing ("PPT").

305.    Ahmed and Elmont PT's charges for the PPT were also fraudulent in that the PPT were medically unnecessary, and Ahmed and Elmont PT unbundled the charges for the PPT to fraudulently inflate the charges for the PPT that they submitted to GEICO by an order of magnitude.

306.    Ahmed and Elmont PT, pursuant to the fraudulent treatment and billing protocol

designed solely to maximize profits, unbundled what should have been – at most – a single charge under CPT code 97750 for 15 minutes of testing that is performed.  CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge for every 15 minutes of testing that is performed. CPT code 97750 does not permit multiple, independent charges for PPT on various extremities or body parts.

307.    Even so, Ahmed and Elmont PT unbundled their charges for PPT by submitting multiple, independent charges for PPT on various extremities or body parts. Through this fraudulent billing protocol, Ahmed and Elmont PT routinely inflated the charges they submitted to GEICO for each distinct session of PPT by submitting six separate charges for CPT code 97750 and a total billing of $249.96 for what should have been – at most – a single charge.

308.    In addition to unbundling the charges for the PPT to fraudulently inflate the charges that they submitted to GEICO, the PPT was also clinically useless in the manner employed by the Defendants.

309.    In keeping with the fact that the PPT were medically useless, and provided – to the extent they were provided at all – solely for financial gain, the purported results of the PPT were never incorporated into the Insureds' treatment plans, nor were the Insureds' treatment plans ever assessed or modified based on the purported results of the PPT. Rather, the Defendants continued to operate pursuant to the fraudulent predetermined treatment protocol, regardless of the Insureds' individual symptoms or actual response to the purported treatment.

310.    Additionally, the charges submitted by Ahmed and Elmont PT for the PPT under CPT code 97750 were fraudulent because they falsely represented that Ahmed and Elmont PT prepared written reports interpreting the test data and documenting the total time spent with the patient.

311.    Pursuant to the Fee Schedule, when a health care provider submits a charge for testing using CPT code 97750, the provider represents that it has prepared a written report (i) interpreting the data obtained from the test; (ii) documenting the total time spent with the patient; and (iii) documenting the impact of the testing on the patient's plan of care.

312.    The CPT Assistant states that "As code 97750 is a time-based code, the test or measurement procedure as well as the time spent analyzing and interpreting the results in the presence of the patient are elements of the visit that must be documented."

313.    The CPT Assistant also states that "[t]hree time elements must be documented to correctly report code 97750:

> (i)    Total time spent with the patient in providing the test and measurement, including the time spent preparing the patient for the test and measurement procedure;
>
> (ii)    The time spent performing the selected protocol; and
>
> (iii)    The time spent with the patient in providing any post-testing instructions."

314.    The CPT Assistant also states that "[t]he elements of documentation that support the reporting of code 97750, include documentation of the testing elements and/or protocols, documentation and interpretation of the data collected, and impact on the patient's plan of care (*i.e.*, discharge, return to sport or activities of daily living (ADL), or modification of treatment)."

315.    Though Ahmed and Elmont PT routinely submitted billing for the PPT using CPT code 97750, Ahmed and Elmont PT did not prepare written reports interpreting the results of the purported PPT tests, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

316.    Therefore, even if Ahmed and Elmont PT had satisfied the other requirements to submit their billing for PPT under CPT code 97750 – and they did not – Ahmed and Elmont PT's billing still would not be in compliance with the Fee Schedule due to a failure to submit a

separate, distinctly identifiable, and signed written report interpreting the results of the purported PPT, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

317.    Ahmed and Elmont PT did not prepare written reports interpreting the data obtained from the tests, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care because the tests were not meant to impact any Insured's course of treatment. Rather – to the extent they were performed at all – the PPT were performed as part of the Defendants' predetermined fraudulent treatment and billing protocol and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

318.    The PPT were simply another component of the Defendants' fraudulent predetermined treatment and billing protocols, which permitted them to submit, or cause to be submitted bills for hundreds of dollars per Insured for each PPT allegedly provided.

319.    As with the other Fraudulent Services, the Management Defendants' and Ahmed and Elmont PT's billing for and alleged performance of initial examinations was purportedly provided pursuant to the Defendants' fraudulent treatment and billing protocol designed to financially enrich the Defendants, pursuant to the Defendants' illegal kickback and referral arrangements, and pursuant to the dictates of the Management Defendants, rather than to provide genuine care to the Insureds.

D.    **The Fraudulent Billing for Independent Contractor Services through 713 Medicine and MK Medical**

320.    The Management Defendants and the Medical PC Defendants' fraudulent scheme also included the submission of claims to GEICO on behalf of the Medical PC Defendants seeking payment for services provided by individuals—specifically, unlicensed technicians—

who were never employed by Kovalevskiy or the Medical PC Defendants.

321.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

322.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

323.    Virtually every bill submitted to GEICO by the Management Defendants and the Medical PC Defendants represented that Kovalevskiy was the "treating provider" who performed

the purported ESWT.

324.    In reality, these representations were often false. Virtually all of the purported ESWT were instead performed by individuals whom the Management Defendants and the Medical PC Defendants, in order to maximize their profits, treated as independent contractors rather than direct employees.

325.    As noted above, Kovalevskiy testified during the MK Medical Examination Under Oath on June 9, 2022 that he does not personally use the ESWT machine.  Instead, MK Medical outsources the work to technicians, including but not limited to Roman Monakhov and the company Terra MSR Inc., who charges MK Medical a daily fee for the ESWT technician services.

326.    Further, Kovalevskiy testified during the 713 Medicine Examination Under Oath on April 20, 2023 that Roman Monakhov also performs the ESWT for 713 Medicine and Kovalevskiy is not in the room with Monakhov when he performs the purported ESWT.

327.    Additionally, the unlicensed technicians who performed services on behalf of the Management Defendants and the Medical PC Defendants typically did so with no supervision by Kovalevskiy.

328.    By electing to treat the healthcare professionals as independent contractors, the Management Defendants and the Medical PC Defendants realized significant economic benefits – for instance:

   (i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

   (ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

   (iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv) avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v) avoiding the need to secure any malpractice insurance; and

(vi) avoiding claims of agency-based liability arising from work performed by the health care professionals.

329. Because virtually all of the purported ESWT, to the extent provided at all, were performed by individuals not employed by the Management Defendants and the Medical PC Defendants, the Medical PC Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the purported ESWT, in addition to all others identified in this Complaint. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

## III. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

330. To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3, HCFA-1500 forms, and/or treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

331. The NF-3, HCFA-1500 forms, and/or treatment reports submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i) The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the PC Defendants uniformly misrepresented to GEICO that the PC Defendants were lawfully licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they were professional healthcare corporations that were fraudulently incorporated

and/or unlawfully owned and controlled by, and split fees with, the Management Defendants, who are not licensed medical professionals.

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iii)    The NF-3, HCFA-1500 forms and supporting documentation submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services, to the extent provided at all, were not medically necessary and were provided pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to genuinely treat or otherwise benefit the Insureds;

(iv)    The NF-3, HCFA-1500 forms and supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented and exaggerated the level, nature, and necessity of the Fraudulent Services that purportedly were provided; and

(v)     Virtually all of the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Medical PC Defendants for purported ESWT uniformly misrepresented to GEICO that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Medical PC Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

332.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

333.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

334.    Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the PC Defendants were in violation of licensing laws, illegally owned and controlled by laypersons, and engaged in fee-splitting and kickback

arrangements and, therefore, were ineligible to bill for or collect No-Fault Benefits.

335.    Additionally, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery of the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

336.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully paid kickbacks in exchange for patient referrals.

337.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

338.    In addition, the Management Defendants and the Medical PC Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed technicians and/or others who rendered services on behalf the Medical PC Defendants in order to prevent GEICO from discovering that the unlicensed technicians and/or others performing many of the Fraudulent Services were not employed by the Management Defendants and the Medical PC Defendants.

339.    Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full, intentionally using legitimate courts of law and arbitral tribunals as tools to monetize their exploitation of the New York No-fault insurance system.

340.    Defendants' collection efforts through numerous separate No-fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

341.    GEICO is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did, cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $711,000.00 based upon the fraudulent charges.

342.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

343.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

344.    There is an actual case in controversy between GEICO, Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants regarding more than $1,080,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to GEICO.

345.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants have no right to receive payment from GEICO on the unpaid billing because the billed-for services were

submitted through healthcare practices not legitimately owned or controlled by licensed healthcare professionals as required by law, but which were operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

346.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback payments made in exchange for patient referrals.

347.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds.

348.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

349.    Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

350.    Kovalevskiy and the Medical PC Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the

extent that they were provided at all – were provided by independent contractors, rather than by employees of the Medical PC Defendants.

351.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants.

<div align="center">

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Kovalevskiy and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

</div>

352.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

353.    713 Medicine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

354.    Kovalevskiy and the Management Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of 713 Medicine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that 713 Medicine was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate

decisions by licensed healthcare providers; (iii) the billed-for services were provided – to the extent provided at all – pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (v) Kovalevskiy and 713 Medicine obtained its patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of Kovalevskiy or 713 Medicine. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

355.    713 Medicine's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kovalevskiy and the Management Defendants operated 713 Medicine, inasmuch as 713 Medicine is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for 713 Medicine to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Kovalevskiy and the Management Defendants continue to submit fraudulent billing to GEICO through 713 Medicine and continue to attempt collection on the fraudulent billing submitted through 713 Medicine to the present day.

356.    713 Medicine is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by 713 Medicine in pursuit of inherently unlawful goals –

namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

357.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $546,000.00 pursuant to the fraudulent bills submitted through 713 Medicine.

358.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
**Against Kovalevskiy, the Management Defendants, Paramount, Balance Chiro, Active Chiro, Todd, Sacrum Chiro, Sakini, and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

359.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

360.    713 Medicine is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

361.    Kovalevskiy, the Management Defendants, Paramount, Balance Chiro, Active Chiro, Todd, Sacrum Chiro, Sakini, and the John Doe Defendants are employed by and/or associated with 713 Medicine's enterprise.

362.    Kovalevskiy, the Management Defendants, Paramount, Balance Chiro, Active Chiro, Todd, Sacrum Chiro, Sakini, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of 713 Medicine's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments 713 Medicine was not eligible to receive under the No-Fault Laws

because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (v) Kovalevskiy and 713 Medicine obtained its patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of Kovalevskiy or 713 Medicine.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1."

363.    Kovalevskiy, the Management Defendants, Paramount, Balance Chiro, Active Chiro, Todd, Sacrum Chiro, Sakini, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (*i.e.*, to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

364.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $546,000.00 pursuant to the fraudulent bills submitted by the Management Defendants, Kovalevskiy, and 713 Medicine through 713 Medicine.

365.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Kovalevskiy, 713 Medicine, and the Management Defendants**
**(Common Law Fraud)**

366.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

367.    Kovalevskiy, 713 Medicine, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

368.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that 713 Medicine was properly licensed and was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed 713 Medicine; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed

laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that the billed-for services were provided by employees of Kovalevskiy and 713 Medicine, when in fact many of the billed-for services were provided by independent contractors.

369.    Kovalevskiy, 713 Medicine, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through 713 Medicine that were not compensable under the No-Fault Laws.

370.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $546,000.00 pursuant to the fraudulent bills submitted by Kovalevskiy, 713 Medicine, and the Management Defendants through 713 Medicine.

371.    Kovalevskiy, 713 Medicine, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

372.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<div align="center">

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Kovalevskiy, 713 Medicine, and the Management Defendants**
**(Unjust Enrichment)**

</div>

373.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

374.    As set forth above, Kovalevskiy, 713 Medicine, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

375.     When GEICO paid the bills and charges submitted by or on behalf of Kovalevskiy, 713 Medicine, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Kovalevskiy, 713 Medicine, and the Management Defendants' improper, unlawful, and/or unjust acts.

376.     Kovalevskiy, 713 Medicine, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kovalevskiy, 713 Medicine, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

377.     Kovalevskiy, 713 Medicine, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

378.     By reason of the above, Kovalevskiy, 713 Medicine, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $546,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Kovalevskiy, Paramount, and the Management Defendants
### (Common Law Fraud)

379.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

380.     Kovalevskiy, Paramount, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for the Fraudulent Services.

381.     The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that Paramount was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed Paramount; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that the billed-for services were provided by employees of Kovalevskiy and Paramount, when in fact many of the billed-for services were provided by independent contractors.  The claims submitted to GEICO in connection with Kovalevskiy, Paramount, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "3."

382.    Kovalevskiy, Paramount, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Chiro that were not compensable under the No-Fault Laws.

383.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $24,000.00 pursuant to the fraudulent bills submitted by Kovalevskiy and the Management Defendants through Paramount.

384.    Kovalevskiy, Paramount, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

385.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<div align="center">

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Against Kovalevskiy, Paramount, and the Management Defendants**
**(Unjust Enrichment)**

</div>

386.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

387.    As set forth above, Kovalevskiy, Paramount, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

388.    When GEICO paid the bills and charges submitted by or on behalf of Kovalevskiy, Paramount, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Kovalevskiy, Paramount, and the Management Defendants' improper, unlawful, and/or unjust acts.

389.    Kovalevskiy, Paramount, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Kovalevskiy, Paramount, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

390.    Kovalevskiy, Paramount, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

391.    By reason of the above, Kovalevskiy, Paramount, and the Management Defendants

have been unjustly enriched in an amount to be determined at trial, but in no event less than $24,000.00.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**Against Todd, Active Chiro, and the Management Defendants**
**(Common Law Fraud)**

392. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

393. Todd, Active Chiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

394. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Active Chiro was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed Active Chiro; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers. The claims submitted to GEICO in

connection with Todd, Active Chiro, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "5."

395.    Todd, Active Chiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Active Chiro that were not compensable under the No-Fault Laws.

396.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $120,000.00 pursuant to the fraudulent bills submitted by Todd, Active Chiro, and the Management Defendants through Active Chiro.

397.    Todd, Active Chiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

398.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Todd, Active Chiro, and the Management Defendants**
**(Unjust Enrichment)**

399.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

400.    As set forth above, Todd, Active Chiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

401.    When GEICO paid the bills and charges submitted by or on behalf of Todd, Active Chiro, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was

legally obligated to make such payments based on the Todd, Active Chiro, and the Management Defendants' improper, unlawful, and/or unjust acts.

402.    Todd, Active Chiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Todd, Active Chiro, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

403.    Todd, Active Chiro, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

404.    By reason of the above, Todd, Active Chiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $120,000.00.

<div align="center">

**AS AND FOR A TENTH CAUSE OF ACTION**
**Against Todd, Balance Chiro, and the Management Defendants**
**(Common Law Fraud)**

</div>

405.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

406.    Todd, Balance Chiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

407.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Balance Chiro was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants

unlawfully and secretly controlled, operated and managed Balance Chiro; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.  The claims submitted to GEICO in connection with Todd, Balance Chiro, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "4."

408.    Todd, Balance Chiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Balance Chiro that were not compensable under the No-Fault Laws.

409.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by Todd, Balance Chiro, and the Management Defendants through Balance Chiro.

410.    Todd, Balance Chiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

411.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and

proper.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**Against Todd, Balance Chiro, and the Management Defendants**
**(Unjust Enrichment)**

412.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

413.    As set forth above, Todd, Balance Chiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

414.    When GEICO paid the bills and charges submitted by or on behalf of Todd, Balance Chiro, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Todd, Balance Chiro, and the Management Defendants' improper, unlawful, and/or unjust acts.

415.    Todd, Balance Chiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Todd, Balance Chiro, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

416.    Todd, Balance Chiro, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

417.    By reason of the above, Todd, Balance Chiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $177,000.00.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**Against Sakini, Sacrum Chiro, and the Management Defendants**
**(Common Law Fraud)**

418.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

419.    Sakini, Sacrum Chiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

420.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sacrum Chiro was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed Sacrum Chiro; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.  The claims submitted to GEICO in connection with Sakini, Sacrum Chiro, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "8."

421.    Sakini, Sacrum Chiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sacrum Chiro that were not compensable

under the No-Fault Laws.

422.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $103,000.00 pursuant to the fraudulent bills submitted by Sakini, Sacrum Chiro, and the Management Defendants through Sacrum Chiro.

423.    Sakini, Sacrum Chiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

424.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Against Sakini, Sacrum Chiro, and the Management Defendants
### (Unjust Enrichment)

425.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

426.    As set forth above, Sakini, Sacrum Chiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

427.    When GEICO paid the bills and charges submitted by or on behalf of Sacrum Chiro, Sakini, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Sakini, Sacrum Chiro, and the Management Defendants' improper, unlawful, and/or unjust acts.

428.    Sakini, Sacrum Chiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Sakini Sacrum Chiro, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful,

and unjust billing scheme.

429.    Sakini, Sacrum Chiro, and the Management Defendants' payments violates fundamental principles of justice, equity, and good conscience.

430.    By reason of the above, Sakini, Sacrum Chiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $103,000.00.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Against Kovalevskiy and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

431.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

432.    MK Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

433.    Kovalevskiy and the Management Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of MK Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that MK Medical was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by

licensed healthcare providers; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (v) Kovalevskiy and MK Medical obtained its patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of Kovalevskiy or MK Medical. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

434.    MK Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kovalevskiy and the Management Defendants operated MK Medical, inasmuch as MK Medical is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for MK Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Kovalevskiy and the Management Defendants continue to submit fraudulent billing to GEICO through MK Medical and continue to attempt collection on the fraudulent billing submitted through MK Medical to the present day.

435.    MK Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by MK Medical in pursuit of inherently unlawful goals –

namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

436.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,319,000.00 pursuant to the fraudulent bills submitted through MK Medical.

437.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
**Against Kovalevskiy, the Management Defendants, ABA Chiro, Abakin, Todd, Wesley**
**Chiro, Ahmed, Elmont PT, and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

438.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

439.    MK Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

440.    Kovalevskiy, the Management Defendants, ABA Chiro, Abakin, Todd, Wesley Chiro, Ahmed, Elmont PT, and the John Doe Defendants are employed by and/or associated with MK Medical's enterprise.

441.    Kovalevskiy, the Management Defendants, ABA Chiro, Abakin, Todd, Wesley Chiro, Ahmed, Elmont PT, and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of MK Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments MK Medical was not eligible to receive under the No-Fault Laws because: (i)

the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the billed-for services that purportedly were provided; (v) Kovalevskiy and MK Medical obtained its patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of Kovalevskiy or MK Medical. The fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2."

442.    Kovalevskiy, the Management Defendants, ABA Chiro, Abakin, Todd, Wesley Chiro, Ahmed, Elmont PT, and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (*i.e.*, to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

443.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,319,000.00 pursuant to the fraudulent bills submitted by Kovalevskiy, MK Medical, and the Management Defendants through MK Medical.

444.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<div align="center"><b><u>AS AND FOR A SIXTEENTH CAUSE OF ACTION</u><br>Against Kovalevskiy, MK Medical, and the Management Defendants<br>(Common Law Fraud)</b></div>

445.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

446.    Kovalevskiy, MK Medical, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

447.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that MK Medical was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed MK Medical; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to an illegal kickback scheme; (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon

legitimate decisions by licensed healthcare providers; and (v) in every claim, the representation that the billed-for services were provided by employees of Kovalevskiy and MK Medical, when in fact many of the billed-for services were provided by independent contractors.

448.    Kovalevskiy, MK Medical, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through MK Medical that were not compensable under the No-Fault Laws.

449.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,319,000.00 pursuant to the fraudulent bills submitted by Kovalevskiy, MK Medical, and the Management Defendants through MK Medical.

450.    Kovalevskiy, MK Medical, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

451.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Against Kovalevskiy, MK Medical, and the Management Defendants**
**(Unjust Enrichment)**

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

453.    As set forth above, Kovalevskiy, MK Medical, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

454.    When GEICO paid the bills and charges submitted by or on behalf of Kovalevskiy,

MK Medical, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

455.    Kovalevskiy, MK Medical, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that MK Medical, Kovalevskiy, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

456.    Kovalevskiy, MK Medical, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

457.    By reason of the above, Kovalevskiy, MK Medical, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,319,000.00.

<div align="center">

**AS AND FOR AN EIGHTEENTH CAUSE OF ACTION**
**Against Abakin, ABA Chiro, and the Management Defendants**
**(Common Law Fraud)**

</div>

458.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

459.    Abakin, ABA Chiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

460.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ABA Chiro was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment

pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed ABA Chiro; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.   The claims submitted to GEICO in connection with Abakin, ABA Chiro, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "7."

461.    Abakin, ABA Chiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ABA Chiro that were not compensable under the No-Fault Laws.

462.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 pursuant to the fraudulent bills submitted by Abakin, ABA Chiro, and the Management Defendants through ABA Chiro.

463.    Abakin, ABA Chiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

464.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and

punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### Against Abakin, ABA Chiro, and the Management Defendants
### (Unjust Enrichment)

465.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

466.    As set forth above, Abakin, ABA Chiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

467.    When GEICO paid the bills and charges submitted by or on behalf of Abakin, ABA Chiro, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

468.    Abakin, ABA Chiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Abakin, ABA Chiro, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

469.    Abakin, ABA Chiro, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

470.    By reason of the above, Abakin, ABA Chiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $147,000.00.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against Todd, Wesley Chiro, and the Management Defendants
### (Common Law Fraud)

471.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

472.    Todd, Wesley Chiro, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

473.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Wesley Chiro was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed Wesley Chiro; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to  the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers. The claims submitted to GEICO in connection with Todd, Wesley Chiro, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "6."

474.    Todd, Wesley Chiro, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort

to induce GEICO to pay charges submitted through Wesley Chiro that were not compensable under the No-Fault Laws.

475.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $141,000.00 pursuant to the fraudulent bills submitted by Todd, Wesley Chiro, and the Management Defendants through Wesley Chiro.

476.    Todd, Wesley Chiro, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

477.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY FIRST CAUSE OF ACTION
**Against Todd, Wesley Chiro, and the Management Defendants**
**(Unjust Enrichment)**

478.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

479.    As set forth above, Todd, Wesley Chiro, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

480.    When GEICO paid the bills and charges submitted by or on behalf of Todd, Wesley Chiro, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

481.    Todd, Wesley Chiro, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Todd, Wesley Chiro,

and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

482. Todd, Wesley Chiro, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

483. By reason of the above, Todd, Wesley Chiro, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $141,000.00.

<div align="center">

### AS AND FOR A TWENTY SECOND CAUSE OF ACTION
**Against Ahmed, Elmont PT, and the Management Defendants**
**(Common Law Fraud)**

</div>

484. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

485. Ahmed, Elmont PT, and the Management Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

486. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Elmont PT was properly licensed and was being legitimately used to bill for the Fraudulent Services, making it eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact the Management Defendants unlawfully and secretly controlled, operated and managed Elmont PT; (ii) in every claim, the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) in every claim, the representation that the billed-

for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to an illegal kickback scheme; and (iv) in every claim, the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers. The claims submitted to GEICO in connection with Ahmed, Elmont PT, and the Management Defendants' fraudulent scheme are identified, in part, in the chart annexed hereto as Exhibit "9."

487. Ahmed, Elmont PT, and the Management Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Elmont PT that were not compensable under the No-Fault Laws.

488. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $248,000.00 pursuant to the fraudulent bills submitted by Ahmed, Elmont PT, and the Management Defendants through Elmont PT.

489. Ahmed, Elmont PT, and the Management Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

490. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY THIRD CAUSE OF ACTION
### Against Ahmed, Elmont PT, and the Management Defendants
### (Unjust Enrichment)

491. GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

492.    As set forth above, Ahmed, Elmont PT, and the Management Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

493.    When GEICO paid the bills and charges submitted by or on behalf of Ahmed, Elmont PT, and the Management Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

494.    Ahmed, Elmont PT, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Ahmed, Elmont PT, and the Management Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

495.    Ahmed, Elmont PT, and the Management Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

496.    By reason of the above, Ahmed, Elmont PT, and the Management Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $248,000.00.

### AS AND FOR A TWENTY FOURTH CAUSE OF ACTION
**Against Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed
(Violation of RICO, 18 U.S.C. § 1962(c))**

497.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

498.    713 Medicine, Paramount, MK Medical, Active Chiro, Balance Chiro, Sacrum Chiro, ABA Chiro, Wesley Chiro, and Elmont PT together constitute an association-in-fact "enterprise" (the "Kovalevskiy Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4),

that engages in activities which affect interstate commerce.

499. The members of the Kovalevskiy Fraud Enterprise are and have been associated through time, joined in purposed and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, 713 Medicine, Paramount, MK Medical, Active Chiro, Balance Chiro, Sacrum Chiro, ABA Chiro, Wesley Chiro, and Elmont PT are independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

500. The Kovalevskiy Fraud Enterprise operated under multiple separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Kovalevskiy Fraud Enterprise acting singly or without the aid of each other.

501. The Kovalevskiy Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (*i.e.*, the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments

from insurance companies to support all of the aforesaid functions.

502.    Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed have been employed by and/or associated with the Kovalevskiy Fraud Enterprise.

503.    Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Kovalevskiy Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Kovalevskiy Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were submitted through healthcare practices not legitimately owned or controlled by a licensed physician, but which were operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (v) the PC Defendants obtained their patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of the Medical PC Defendants. The fraudulent charges and corresponding mailings

submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of Complaint are described, in part, in the chart annexed hereto as Exhibits "1" through "9."

504.    The Kovalevskiy Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed operate the Kovalevskiy Fraud Enterprise, inasmuch as the Kovalevskiy Fraud Enterprise never operated legitimate healthcare practices, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through each of the PC Defendants to the present day.

505.    The Kovalevskiy Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Kovalevskiy Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,825,000.00 pursuant to the fraudulent bills submitted by Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed through the Kovalevskiy Fraud Enterprise.

506.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and

proper.

### AS AND FOR A TWENTY FIFTH CAUSE OF ACTION
**Against Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, Ahmed, and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

507.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

508.    The Kovalevskiy Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

509.    Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, Ahmed and the John Doe Defendants are employed by and/or associated with the Kovalevskiy Fraud Enterprise.

510.    Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, Ahmed and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Kovalevskiy Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that 713 Medicine, Paramount, MK Medical, Active Chiro, Balance Chiro, Sacrum Chiro, ABA Chiro, Wesley Chiro, and Elmont PT were not eligible to receive under the No-Fault Laws because: (i) the Fraudulent Services were submitted through a healthcare practices not legitimately owned or controlled by a licensed physician, but which were operated, managed, and controlled by the Management Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the Fraudulent Services were provided – to the extent provided at all – pursuant to

pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; (v) the PC Defendants obtained its patients through the Defendants' illegal kickback scheme; and (vi) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of the Medical PC Defendants. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "9."

511.    Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (*i.e.*, to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

512.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,825,000.00 pursuant to the fraudulent bills submitted by Defendants through 713 Medicine, Paramount, MK Medical, Active Chiro, Balance Chiro, Sacrum Chiro, ABA Chiro, Wesley Chiro, and Elmont PT.

513.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## **JURY DEMAND**

514.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against all Kovalevskiy, the Nominal Owner Defendants, and the PC Defendants a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Kovalevskiy and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $546,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Kovalevskiy, the Management Defendants, Paramount, Balance Chiro, Active Chiro, Todd, Sacrum Chiro, Sakini, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $546,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kovalevskiy, 713 Medicine, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $546,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Kovalevskiy, 713 Medicine, and the Management Defendants, more than $546,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.    On the Sixth Cause of Action against Kovalevskiy, Paramount, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $24,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.    On the Seventh Cause of Action against Kovalevskiy, Paramount, and the Management Defendants, more than $24,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

H.    On the Eighth Cause of Action against Todd, Active Chiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $120,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

I.    On the Ninth Cause of Action against Todd, Active Chiro, and the Management Defendants, more than $120,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.    On the Tenth Cause of Action against Todd, Balance Chiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $177,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

K.    On the Eleventh Cause of Action against Todd, Balance Chiro, and the Management Defendants, more than $177,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

L.    On the Twelfth Cause of Action against Sakini, Sacrum Chiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be

determined at trial but more than $103,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against Sakini, Sacrum Chiro, and the Management Defendants, more than $103,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Kovalevskiy and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1,319,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Kovalevskiy, the Management Defendants, ABA Chiro, Abakin, Todd, Wesley Chiro, Ahmed, Elmont PT, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1,319,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against Kovalevskiy, MK Medical, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1,319,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against Kovalevskiy, MK Medical, and the Management Defendants, more than $1,319,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Abakin, ABA Chiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be

determined at trial but more than $147,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Abakin, ABA Chiro, and the Management Defendants, more than $147,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Todd, Wesley Chiro, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $141,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

U.      On the Twenty First Cause of Action against Todd, Wesley Chiro, and the Management Defendants, more than $141,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty Second Cause of Action against Ahmed, Elmont PT, and the Management Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $248,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

W.      On the Twenty Third Cause of Action against Ahmed, Elmont PT, and the Management Defendants, more than $248,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty Fourth Cause of Action against Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, and Ahmed, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $2,825,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

Y.      On the Twenty Fifth Cause of Action against Kovalevskiy, the Management Defendants, Todd, Sakini, Abakin, Ahmed, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $2,825,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: December 16, 2024

RIVKIN RADLER LLP


By:  /s/  *Barry I. Levy*

Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Garin Scollan, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*